SHAWN A. LUIZ (6855)
841 Bishop Street, Suite 200
Honolulu, Hawaii  96813
Telephone:  (808) 538 - 0500
Facsimile:  (808) 564 - 0010
E - mail: attorneyluiz@gmail.com

Michael Jay Green (4451)
Michael Jay Green & Associates, Inc.
841 Bishop Street, Suite 2201
Honolulu, Hawaii  96813
Telephone:   (808) 521-3336
Fax:         (808) 566-0347
E - mail: michael@michaeljaygreen.com

Kristin Coccaro, Esq. (8061)
Empire Law, LLLC
PO Box 880831
Pukalani, HI 96788
808.633.8542 Office
808.466.3622 Fax
kristin@empire-law.com

Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | | |
|---|---|---|
| KAIMI K. PELEKAI; KEITH DANIEL MICHAEL; MINORU NAKAGAWA; MANAHEL AL-HOZAIL; THERESA MCGREGOR; FREDERIC NEWTON BOOTH III; TAMAYO PERRY; VINCENT TRIPI; JOZLYN HARRINGTON; ANTHONY PANGAN; CLYDE HOLOKAI; JOSHUA DUKES; on behalf of themselves and all other similarly situated persons, | ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL NO. _____ (Other Civil Rights)  CLASS ACTION  **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL; SUMMONS** |

|  | ) |
| --- | --- |
| Plaintiffs, | ) |
|  | ) |
| vs. | ) |
|  | ) |
|  | ) |
| STATE OF HAWAIʻI; DAVID Y. | ) |
| IGE, in his official capacity as | ) |
| Governor of the State of Hawaii; | ) |
| CITY AND COUNTY OF | ) |
| HONOLULU; RICK BLANGIARDI, | ) |
| in his official capacity as Mayor of the | ) |
| City and County of Honolulu, | ) |
| COUNTY OF MAUI; MICHAEL P. | ) |
| VICTORINO, in his official capacity | ) |
| as Mayor of the County of Maui; | ) |
| XAVIER BECERRA, in his official | ) |
| capacity as United States Secretary of | ) |
| Health and Human Services; JOHN | ) |
| AND JANE DOES 1-10; DOE | ) |
| PARTNERSHIPS 1-10; DOE | ) |
| CORPORATIONS 1-10; and OTHER | ) |
| DOE ENTITIES 1-10, | ) |
|  | ) |
| Defendants. | ) |
| _____ | ) |

## **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

The above-named Plaintiffs, by and through their attorneys, and for their

Complaint against the above-named Defendants, in their official capacities, allege

and aver as follows:

## INTRODUCTION

2

1.     This action arises under 42 U.S.C. § 1983 because of Defendants' deprivation, under color of law, regulation, custom or usage, of Plaintiffs' constitutional rights to due process and equal protection under the First, Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution.

2.     This lawsuit is brought by the named Plaintiffs on behalf of the more than 1,200 "similarly situated first responders" consisting of the Honolulu Fire Department, the Honolulu Police Department, the Maui Fire Department, the Maui Police Department, Honolulu Emergency Medical Services Department, and the Honolulu Ocean Safety Department, who have been unlawfully denied their federal statutory and federal constitutional rights by the Defendants as set forth more fully below.

3.     Plaintiffs seek a declaration that Defendants violated the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution; denied the Plaintiffs procedural and substantive due process, and violated the Civil Rights Act of 1871, 42 U.S.C. § 1983.  Plaintiffs also seek injunctive relief to require Defendants to prospectively comply with federal statutory and constitutional law.

## JURISDICTION

4.     This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and § 1343, and has authority to award the requested declaratory relief pursuant to 28 U.S.C. § 2201, to grant the requested injunctive relief

pursuant to 28 U.S.C. § 1343(a) and 42 U.S.C. §1983, and has authority to award attorneys' fees and costs pursuant to 42 U.S.C. § 1988. This action arises under 21 21 U.S. Code § 360bbb–3, *et seq*., and 42 U.S.C. § 1983.

## VENUE

5.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(1) since all Defendants reside in the District of Hawai'i.

## PARTIES

6.     Plaintiff Kaimi K. Pelekai is a 20-year veteran and currently a Fire Captain with the City and County of Honolulu Fire Department. Mr. Pelekai is a resident of the City and County of Honolulu. Mr. Pelekai sues on his own behalf and on behalf of others similarly situated.

7.     Plaintiff Keith Daniel is an 18-year veteran and currently a Fire Fighter 3 with the City and County of Honolulu Fire Department. Mr. Daniel is a resident of the City and County of Honolulu. Mr. Daniel sues on his own behalf and on behalf of others similarly situated.

8.     Plaintiff Michael Minoru Nakagawa is an 18-year veteran and currently a Fire Fighter 3 with the City and County of Honolulu Fire Department. Mr. Nakagawa is a resident of the City and County of Honolulu. Mr. Nakagawa sues on his own behalf and on behalf of others similarly situated.

9.     Plaintiff Manahel Al-hozail (Al-hozail) is a 9-year Mobile Emergency Care Specialist I (Paramedic) veteran with the City and County of Honolulu Emergency Medical Services. Ms. Al-hozail is a resident of the City and County of Honolulu. Ms. Al-hozail sues on her own behalf and on behalf of others similarly situated.

10.     Plaintiff Theresa McGregor is a 18-year Mobile Emergency Care Specialist III (Paramedic) veteran with the City and County of Honolulu Emergency Medical Services. Ms. McGregor is a resident of the City and County of Honolulu.  Ms. McGregor sues on her own behalf and on behalf of others similarly situated.

11.     Plaintiff Frederic Newton Booth III is an 19-year veteran and currently an Ocean Safety Officer II with the City and County of Honolulu Ocean Safety Department. Mr. Booth is a resident of the City and County of Honolulu. Mr. Booth sues on his own behalf and on behalf of others similarly situated.

12.     Plaintiff Tamayo Perry is a 6-year veteran and currently an Ocean Safety Officer II with the City and County of Honolulu Ocean Safety Department. Mr. Perry is a resident of the City and County of Honolulu. Mr. Perry sues on his own behalf and on behalf of others similarly situated.

13.     Plaintiff Vincent Tripi is a 16-year veteran and currently a Police Sergeant with the City and County of Honolulu Police Department. Mr. Tripi is a

resident of the City and County of Honolulu. Mr. Tripi sues on his own behalf and on behalf of others similarly situated.

14.    Plaintiff Jozlyn Harrington, is a 7-year veteran and currently a Metropolitan Patrol Officer with the City and County of Honolulu Police Department. Ms. Harrington is a resident of the City and County of Honolulu. Ms. Harrington sues on her own behalf and on behalf of others similarly situated.

15.    Plaintiff Anthony Pangan is a 9-year veteran and currently a Metropolitan Patrol Officer with the City and County of Honolulu Police Department. Mr. Pangan is a resident of the City and County of Honolulu. Mr. Pangan sues on his own behalf and on behalf of others similarly situated.

16.    Plaintiff Clyde Holokai, is a 27-year veteran and currently an Assistant Chief with the Maui Police Department. Mr. Holokai is a resident of the County of Maui. Mr. Holokai sues on his own behalf and on behalf of others similarly situated.

17.    Plaintiff Joshua Dukes is a 10-year veteran and currently a Fire Fighter 2 with the Maui Fire Department. Mr. Dukes is a resident of the County of Maui. Mr. Dukes sues on his own behalf and on behalf of others similarly situated.

18.    Defendant the STATE OF HAWAI'I is a sovereign governmental entity authorized and existing under the Constitution of the United States and the Constitution of the State of Hawai'i.

19.    Defendant DAVID Y. IGE is sued in his official capacity as Governor of the State of Hawaiʻi.

20.    Governor IGE has the responsibility to ensure that the agencies of the Executive Branch of the State of Hawaiʻi, act in full compliance with the Constitution and the laws of the United States.

21.    Defendant CITY AND COUNTY OF HONOLULU is a body corporate chartered by the State of Hawai'i.  Defendant at all times pertinent hereto was, is, and will remain located in the State of Hawai'i.

22.    Defendant RICK BLANGIARDI ("BLANGIARDI ") is sued in his official capacity as Mayor of the City and County of Honolulu.  As Mayor, BLANGIARDI has the responsibility to ensure that the agencies of the City and County of Honolulu act in full compliance with the Constitution and the laws of the United States.

23.    Defendant COUNTY OF MAUI is a body corporate chartered by the State of Hawai'i.  Defendant at all times pertinent hereto was, is, and will remain located in the State of Hawai'i.

24.    Defendant MICHAEL P. VICTORINO, in his official capacity as Mayor of the County of Maui. As Mayor, VICTORINO has the responsibility to ensure that the agencies of the County of Maui act in full compliance with the Constitution and the laws of the United States.

25.     Defendant XAVIER BECERRA, is sued in his official capacity as United States Secretary of Health and Human Services. The United States Secretary of Health and Human Services approved and/or allowed continued approval of the EUA for the subject mandated vaccines setting into motion the current deprivation of the Plaintiffs federal statutory and federal constitutional rights.

26.     Defendants JOHN AND JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE CORPORATIONS 1-10; and OTHER DOE ENTITIES 1-10, are individuals, partnerships, corporations and entities who are sued herein under fictitious names for the reason that their true names and/or responsibilities are presently unknown to Plaintiffs except that Plaintiffs are informed and believe that they are connected in some manner with known Defendants and/or are responsible for all or a portion of the conduct and damages alleged herein which occurred on or about the dates and times more particularly described in this Complaint, and who are or may be necessary parties in order for the Court to grant the appropriate relief in this matter.  Plaintiffs have initiated a review of the respective responsibilities relating to its Complaint, as described herein, as a diligent and good faith effort to ascertain the identity, actions and liability of said unidentified Defendants. Plaintiffs will make the name or identity of the Defendants known within a reasonable time after Plaintiffs identify such Defendants and/or their responsibilities.

27.    All defendants have at all relevant times acted under color of state law and knew of or should have known of the policies, practices, acts and conditions alleged.

## CLASS ACTION ALLEGATIONS

28.    The named Plaintiffs bring this action on their own behalf and on behalf of all other similarly situated persons pursuant to Federal Rules of Civil Procedure, Rule 23(a), and (b)(2).

29.    The proposed class consists of all current and future first responders on the Islands of Oahu and Maui subjected to the current COVID-19 vaccine mandate.

30.    The requirements of Federal Rules of Civil Procedure, Rule 23 (a) are satisfied in this case as follows:

a.    Numerosity: The class is so numerous that joinder of all members is impracticable.  Upon information and belief, the class consists of more than 1,200 individuals.

b.    Commonality: There are questions of law or fact common to all named Plaintiffs as well as to all members of the class, to wit: whether the Defendants' Vaccine Mandate violated 42 U.S.C. § 1983, 21 U.S. Code § 360bbb–3, *et seq*., and the Due Process and Equal Protection Clauses of the Constitution of the United States.

c.    Typicality: The claims of the named Plaintiffs are typical of the

claims of the class as a whole.

d. <u>Adequate Representation:</u> By filing this action, the named Plaintiffs, have displayed an interest in vindicating their rights, as well as the claims of others who are similarly situated.  The named Plaintiffs will fairly and adequately protect and represent the interests of the class.  Furthermore, the named Plaintiffs are represented by legal counsel who are skilled and knowledgeable about civil rights litigation, practice and procedure in the federal courts, and the prosecution and management of class action litigation.  The relief sought by the named Plaintiffs will inure to the benefit of members of the class generally.

31.     The requirement of Federal Rules of Civil Procedure, Rule 23 (b) (2) is also satisfied.  The Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate declaratory and injunctive relief with respect to the class as a whole.

## STATUTORY AND CONSTITUTIONAL FRAMEWORK

32.     This case arises under the Emergency Authorization Act, codified at 21 U.S.C. § 360bbb-3 and the Civil Rights Act of 1871, 42 U.S.C. § 1983; the First and Fourth Amendments to the United States Constitution, and the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments to the United States Constitution.

## DEFENDANTS' WRONGFUL ACTIONS

33.     On February 5, 2021, Governor Ige issued another "EMERGENCY

PROCLAMATION RELATED TO THE COVID-19 RESPONSE". The pertinent

sections to this lawsuit stated:

### III. Vaccination and Testing for State and County Employees

Pursuant to sections 127A-12(b)(10), 127A-12(b)(16), 127A-12(b)(19), 127A-13(a)(1) and 89-9(d)(8), HRS, beginning on August 16, 2021, all State and county employees must attest to their respective department, office, or agency whether they are (1) fully vaccinated for COVID-19; (2) partially vaccinated for COVID-19 (including receipt of one dose of a two-dose course of vaccination); or (3) not vaccinated for COVID-19. Consistent with guidance from the CDC, "fully vaccinated" means two weeks have passed since an employee's second dose in a two-dose series or two weeks have passed since a single-dose vaccine.

For purposes of this Proclamation, "State and county employees" means all permanent and temporary employees of the executive branch of the State and its departments, offices, and agencies, including the Department of Education and the University of Hawaiʻi, and all permanent and temporary employees of each of the counties, but excluding unpaid members of boards and commissions.

As an alternative, State and county employees who do not, by August 16, 2021, provide proof that (i) they are fully vaccinated for COVID-19; (ii) have completed a single-dose vaccine; or (iii) have completed the second dose of a two-dose series shall be subject to regular COVID-19 testing and may also be subject to restrictions on official travel. The testing shall occur either once or twice per week, at the discretion of the relevant State or county department, office, or agency. The location of free testing sites can be found on the COVID-19 State of Hawaiʻi Portal (https://hawaiicovid19.com). State and county employees not tested at a free testing site shall be responsible for any testing costs.

State and county employees who provide proof after August 16, 2021 that they are fully vaccinated will no longer be subject to regular COVID-19 testing.

The requirements set forth in this Section shall be enforceable through disciplinary action, up to and including termination. A violation of the provisions of Section III shall not give rise to a prosecution under section 127A-29, HRS, or enforcement as an infraction under chapter 291D, HRS.

All State and county departments, offices, and agencies shall ensure, consistent with law, that any documentation related to vaccination status or test results obtained for purposes of this section are not disclosed to individuals other than as necessary to ensure compliance with this Proclamation or as required by law or court order.

Notwithstanding the provisions set forth in this Section III, the mayor of any county may issue directives related to vaccinations and testing that are applicable only to that county's permanent and temporary employees, as defined by the county. Nothing in this Section III is intended or construed to preempt the mayor of any county from issuing such a vaccination mandate directive.

34.     On August 10, 2021, Mayor Blangiardi issued a COVID-19

Vaccination Policy (Mayor's Directive No. 21-7) for City and County of Honolulu

(City) Employees which provides in pertinent part:

By August 16, 2021, all City employees must be fully vaccinated against COVID-19, partially vaccinated against COVID-19, or have submitted to the City a medical or religious exemption request. City employees who are partially COVID-19 vaccinated having only received the first dose of a two-dose COVID-19 vaccination series must complete their second dose no later than September 16, 2021.

For purposes of this Directive, "City employees" means any regular, probationary, limited term, provisional, or short-term employee, or an employee in an exempt position or on a personal services contract who is currently employed, whether on a full-time or part-time basis. Employees who are employed on an on-call, performance based, hourly or other basis in which they work only when scheduled, are included in this definition. Semi-autonomous agencies and its employees and personnel are also included in this definition as well as all City officers and appointed officials. Excluded from this definition are elected City officials, volunteers, and unpaid members of boards and commissions.

However, with respect to the City Council, pursuant to Haw. Rev. Stat. ch. 127A-11, the chair of the City Council is delegated the mayor's powers under Haw. Rev. Stat. chs. 127A-12 and 127A-13 for the limited purpose of determining the vaccination and testing program that will apply to councilmembers, council staff and council personnel.

"Fully vaccinated" means two weeks have passed after the second dose in a two-dose COVID-19 vaccination series or two weeks have passed after a single-dose COVID-19 vaccination.

"Partially vaccinated" means only the first COVID-19 vaccination dose in a two dose series has been received, or two weeks have not passed since receiving the second dose in a two-dose series; or two weeks have not passed since receiving a single-dose vaccine.

The Department of Human Resources will issue guidelines and procedures that detail the vaccination verification and exemption process.

Employees who fail or refusal to comply with this Directive will be subject to appropriate action, up to and including termination, by the applicable appointing authority or authorized official.

This Directive shall remain in effect until revoked, rescinded, or amended by any subsequent directive, separate and independent of any Governor emergency proclamation or Mayor's emergency order or proclamation.

35.    As a matter of practice, Defendants do not provide Plaintiffs with

procedural due process protections.  Defendants have threatened to deny

accommodations based on any objections to any ingredients on the vaccine in

violation of the First Amendment to the United States Constitution. Defendants

through their agents have told Plaintiffs to get the "jab", "get tested", "retire", or

"find another way to make money". Defendants have exhibited a callousness and

deliberate indifference to clearly established constitutional and statutory rights.

Any changes to the terms and conditions of Plaintiffs' Collective Bargaining

Rights requires negotiation and consent.

36.    Governor Ige has callously and recklessly disregarded these long-

standing principles and entered and Emergency Proclamation suspending Hawaii Revised Chapter 89, thereby leaving Plaintiffs no other avenue of relief other than the federal court to enforce their clearly established federal statutory and constitutional rights.

### **Mandatory PCR Testing**

37.    None of the currently available PCR tests for COVID-19 have received final approval from the Food and Drug Administration. Rather, all such tests are unapproved products that have been authorized for emergency use only under an Emergency Use Authorization.  The July 19, 2021 CDC Lab Alert requires changes to the CDC RT-PCR for SARS-COV-2 testing.

38.    To illustrate this and by way of example, the following language is contained in (and excerpted from) Labcorp's COVID-19 RT-PCR Test EUA Summary, dated May 11, 2021. https://www.fda.gov/media/136151/download.

Results are for the identification of SARS-CoV-2 RNA. The SARS-CoV-2 RNA is generally detectable in respiratory specimens during the acute phase of infection. Positive results are indicative of the presence of SARS-CoV-2 RNA; clinical correlation with patient history and other diagnostic information is necessary to determine patient infection status. Positive results do not rule out bacterial infection or co-infection with other viruses. The agent detected may not be the definite cause of disease. Laboratories within the United States and its territories are required to report all results to the appropriate public health authorities. Negative results do not preclude SARS-CoV-2 infection and should not be used as the sole basis for patient management decisions…The COVID-19 RT-PCR Test is only for use under the Food and Drug Administration's Emergency Use Authorization.

39.    The statute granting the FDA the power to authorize a medical

product for emergency use requires, *inter alia*, that the person being administered the unapproved product be advised of his or her right to refuse administration of the product. *See* 21 U.S.C. § 360bbb-3(e)(1)(A) ("Section 360bbb-3").

40.    At the time of filing, COVID-19 vaccines are not licensed by the Food and Drug Administration ("FDA"). The FDA has not declared Covid-19 vaccines to be "safe and effective" as they are merely 'authorized' by the FDA as a medical counter measure under Emergency Use Authorization (EUAs) 21 U.S.C § 360bbb-3. No FDA approval renders COVID-19 vaccines experimental, and investigational and in the clinical trial stage until 2022 and beyond.

41.    Defendants cannot legally require Covid-19 vaccinations.  The rules related to the U.S. Food and Drug Administration's sped-up procedure for authorizing medical products during a public health emergency leaves such products as "unapproved".

42.    The critical distinction between these experimental, investigational EUA and FDA approved is that federal law allows for an option to refuse them under a guaranteed 'opt-out; provision 21 U.S.C § 360bbb-3.

43.    But even if the FDA prematurely approves these experimental vaccines, Defendants' mandates fail due to the five-part test in Jacobson v. Massachusetts; 1) necessity, 2) proportionality, 3) reasonableness, 4) harm avoidance and 5) non-discrimination. Jacobson pre-dates modern constitutional jurisprudence.

44.     Governor Ige's and Mayor Blangiardi's vaccine mandates are unlawful as applied to Plaintiffs because it violates constitutional and statutory rights, is contrary to federal law, federal precedent, and international law.

45.     There is no "pandemic exception" to the law or the Constitution. Justice Gorsuch concurring *Roman Catholic Diocese v. Cuomo*, 592 U. S. ____ (2020), Per Curiam.

46.     The State and the City receive federal funding including the CARES ACT and other recent Congressional action.  Governor Ige promulgated a mandate that deprives or threatens to deprive Plaintiffs with certain rights, privileges, and immunities under the laws and Constitution of the United States.

### Emergency Use Authorization 21 U.S.C. § 360bbb-3.

47.     Congress enacted Title 21 U.S.C. § 360bbb-3, commonly referred to as Section 564 of the Federal Food, Drug, and Cosmetic Act ("FFDCA") to vest the Secretary of Health and Human Services (HHS) with permissive authority to "authorize the introduction into interstate commerce, during the effective period of a declaration [of emergency], of a drug, device, or biological product intended for use in an actual or potential emergency…." 21 U.S.C. § 360bbb-3(a)(1).

48.     Section 360bbb-3 mandates prospective recipients of unapproved products offered for emergency use be informed of their ***option to accept or refuse administration***:

With respect to the emergency use of an unapproved product, the

Secretary…shall, for a person who carries out any activity for which the authorization is issued, establish such conditions…to protect the public health, including the following:

… (ii) Appropriate conditions designed to ***ensure that individuals to whom the product is administered are informed—***

…(III) of ***the option to accept or refuse administration of the product***.

21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(II) and (III) (emphasis added).

## EUA Background.

49.    Congress vested the HHS Secretary with the power to "authorize the introduction into interstate commerce, during the effective period of a declaration of emergency…a drug, device, or biological product intended for use in an actual or potential emergency. . . ." 21 U.S.C. § 360bbb-3(a)(1) of the Federal Food, Drug, and Cosmetic Act (the "FFDCA"). The statute provides for the FDA to authorize both unapproved products and uses. See 21 U.S.C. § 360bbb-3(a)(2).

50.    The FDA grants emergency use authorization for a vaccine not yet approved or cleared by the United States FDA. When there are no FDA-approved or cleared tests treatment or cure available, and other criteria are met, FDA can make vaccines available under an emergency access mechanism called an Emergency Use Authorization (EUA). The EUA for this test is supported by the Secretary of Health and Human Service's (HHS's) declaration that circumstances exist to justify the emergency use of experimental vaccines to combat the virus that

causes COVID-19. https://www.fda.gov/media/134921/download. Thus, FDA acknowledges that these tests are stopgap measures authorized under emergency circumstances, without the benefit of a rigorous approval or licensing process. Both Ivermectin and Hydroxychloroquine are alternative and proven effective as prophylactic and therapeutic treatments for COVID-19.

## Regulatory Background.

51.     The Food and Drug Administration (FDA) and Centers for Disease Control (CDC) are sister agencies within the U.S. Department of Health and Human Services (HHS). The FDA is a regulatory agency responsible for protecting public health, including regulation of diagnostic medical devices. One of the CDC's responsibilities is to develop and advocate sound public health policies.

52.     During public health emergencies, the FDA regulates medical countermeasures ("MCM") like COVID-19 vaccines for newly emergent infectious diseases, such as COVID-19. Where, as here, the disease threat is novel, the FDA merely authorizes, rather than approves, such products. FD&C Act § 564. The FDA has not approved these vaccines tests for COVID; it has only granted them EUA status. These vaccines remain experimental with no assurance of efficacy.

### 21 U.S.C. § 355 (i) Exemptions of drugs for research; discretionary and mandatory conditions; direct reports to Secretary.

53.     (4) Regulations under paragraph (1) shall provide that such exemption shall be conditioned upon the manufacturer, or the sponsor of the investigation, requiring that experts using such drugs for investigational purposes certify to such manufacturer or sponsor that they will inform any

human beings to whom such drugs, or any controls used in connection therewith, are being administered, or their representatives, that such drugs are being used for investigational purposes and **will obtain the consent of such human beings** or their representatives, except where it is not feasible . . . ."

21 U.S.C. § 355 (i) (emphasis added).

## MILITARY EMERGENCY USE AUTHORIZATION

54.    10 U.S.C. § 1107 provides:

**10 U.S.C. § 1107 (f) Limitation and waiver**
(1) In the case of the administration of an investigational new drug or a drug unapproved for its applied use to a member of the armed forces in connection with the member's participation in a particular military operation, **the requirement that the member provide <u>prior consent</u> to receive the drug in accordance with the <u>prior consent</u> <u>requirement imposed</u>** under section 505(i)(4) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355(i)(4)) may be waived only by the President. The President may grant such a waiver only if the President determines, in writing, that obtaining consent is not in the interests of national security. (emphasis added).

55.    Although this law applies to military personnel, it is the only case where a court ruled on an experimental vaccine mandate. Until the time of FDA approval, a vaccine with an Emergency Use Authorization could not be forced upon soldiers.  *Doe v. Rumsfeld*, 297 F. Supp. 2d 119 (D.D.C. 2003)

*Doe v. Rumsfeld***.**

56.    *Rumsfeld #1* stands for the proposition that where a controlling statute prohibits administration of experimental investigational new drugs, or drugs unapproved for their intended use, without the informed consent of the person to

whom the drug is to be administered, any program or mandate inconsistent with the controlling statute is illegal.

57.    "*Rumsfeld #1*, granted a preliminary injunction against the Dept. of Defense ("DoD") after it instructed military service personnel and civilian contractors to submit to anthrax vaccinations with "an investigational drug and a drug being used for an unapproved purpose" without their informed consent. *Id.* at __.

58.    Later upholding its injunction, the Court stated "[u]nless and until FDA properly classifies [the anthrax] vaccine as a safe and effective drug for its intended use, an injunction shall remain in effect prohibiting defendants' use of [it] on the basis that the vaccine is either a drug unapproved for its intended use or an investigational new drug within the meaning of 10 U.S.C. § 1107. Accordingly, the involuntary anthrax program…is rendered illegal absent informed consent or a Presidential waiver…." *Doe v. Rumsfeld*, 341 F.Supp.2d 1, __ (D.D.C. 2004) (*Rumsfeld #2*).

59.    *Rumsfeld #1* was decided on statutory grounds, 10 U.S.C. § 1107, which "prohibits the administration of investigational new drugs, or drugs unapproved for their intended use, to service members without their informed consent[,]" absent a Presidential waiver. *Rumsfeld #1, id.* at __. There, like here, "the central question [was] whether [the anthrax vaccine] [was] being used as an investigational new drug or as a drug unapproved for its intended use." *Id*. at __.

The reason that was the central question is Section 1107's prohibition against forcing military personnel to take the anthrax vaccine depended on the vaccine's status: Was it an investigational new drug or a drug unapproved for its intended use? Or was it FDA-approved for its use?  After reviewing the anthrax vaccine's unclear regulatory history, the court concluded it was "an investigational drug and a drug being used for an unapproved purpose." *Id.* at __.

60.    Applying Rumsfeld #1 to the Rider vaccine mandate, the three COVID-19 vaccines students may choose from are experimental investigational new drugs, still in the clinical trial phase, which are unapproved products, and are not licensed by FDA for any indication.

61.    That conclusion made it easy for the court to grant a preliminary injunction halting DoD's anthrax vaccination program: "As a result of this status, DoD is in violation of 10 U.S.C. § 1107" because that statute prohibits forced vaccination with investigational, unapproved vaccines. "Thus, because the plaintiffs are likely to prevail on the merits…[they] meet the requirements for a preliminary injunction." *Id.* at __.

62.    Plaintiff's right to refuse an experimental investigational vaccine still in the clinical trial phase, is recognized in both *Rumsfeld #1* and *Rumsfeld #2*.

### *Jacobson v. Massachusetts*.

63.    Subsequent to the 1905 Jacobson Decision, the United States Supreme Court has consistently recognized the Constitutional right of every non-

incarcerated individual to remain free from forced medical treatment. *See. e.g., Cruzan v Director, Missouri Dept of Health*, 497 US 261, 279 (1990), "It cannot be disputed that the Due Process Clause protects an interest in life as well as an interest in refusing life-sustaining medical treatment."

64.     Courts have attempted to justify vaccination mandates by citing *Jacobson v. Massachusetts*, 197 U.S. 11 (1905).  Jacobson was decided well before the days of strict scrutiny analysis however legal scholars and public health officials on both sides continue to debate, *Roman Catholic Diocese* Gorsuch concurrence knocked *Jacobson* off its perch.

65.     Justice Gorsuch finally knocked *Jacobson v. Massachusetts* (1905), the landmark Supreme Court decision authorizing broad emergency powers, off its perch. Justice Gorsuch wrote:

> Mr. Jacobson claimed that he possessed an implied "substantive due process" right to "bodily integrity" that emanated from the Fourteenth Amendment and allowed him to avoid not only the vaccine but also the $5 fine (about $140 today) and the need to show he qualified for an exemption.
>
> The Supreme Court disagreed, and over the past 115 years, this case was precedent for hundreds of cases that followed. Until this Supreme Court ruling, Jacobson appeared to put us on a predestined path towards house arrest, aka isolation and quarantine, followed by mandatory vaccination for participation in society.

66.     The *Jacobson* court took judicial notice of common beliefs and elevated them to facts.

While we do not decide and cannot decide that vaccination is a

preventative of smallpox, we take judicial notice of the fact that this is
a common belief of the people of the State … What everybody knows
the court must know …

(Justice Harlan).

67.    1) In 1905 only one vaccine was necessary (or pay a $5 fine); 2) There

was no legal standard that the law had to pass strict scrutiny; 3) There were no

human fetal parts in that Cowpox vaccine; 4) There were not Govt. Mandates of up

to 74 doses for children; 5) There was no zero liability for vaccine makers at the

time; and, 6) Cases that followed *Jacobson*, ignored required balancing of

constitutional rights.

> The police power of a state must be held to embrace, at least, such
> reasonable regulations established directly by legislative enactment as
> will protect the public health and the public safety. The state may
> invest local administrative bodies with authority to safeguard the
> public health and the public safety. The mode or manner is within the
> discretion of the state, subject only to the condition that no rule
> prescribed by a state, nor any regulation adopted by a local
> governmental agency acting under the sanction of state legislation,
> shall contravene the Constitution of the United States or infringe any
> right granted or secured by that instrument. A local enactment or
> regulation must always yield in case of conflict with the exercise by
> the general government of any power it possesses under the
> Constitution, or with any right which  that instrument gives or
> secures.

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905)

68.    Long before this suit was instituted, *Jacobson v. Massachusetts*, 197

U.S. 11, had settled that it is within the police power of a State to provide for

compulsory vaccination while ignoring Constitutional limitations. *Zucht v. King*,

260 U.S. 174-76 (Justice Brandeis delivered the opinion of the Court).

69.    Citing *Jacobson*: The principle that sustains compulsory vaccination is broad enough to cover cutting the Fallopian tubes. *Sup. Ct. Buck v. Bell, 274 U.S. 200 (1927)*. But, *Buck v. Bell* also held, that:  The principle that sustains compulsory vaccination is broad enough to cover cutting the Fallopian tubes and that three generations of imbeciles are enough. *Buck v. Bell*, 274 U.S. 200-207. Justice Oliver Wendell Holmes delivering the opinion of the court.  Just as *Buck v. Bell* can no longer be followed under modern Constitutional jurisprudence, Jacobson can no longer be followed under modern Constitutional jurisprudence with the established right to privacy and autonomy in making personal health care decisions.

70.    The *Jacobson* court took judicial notice of "a common belief of the people" (namely, that vaccines are 'safe enough for government work') and elevated it to 'fact'.  *Jacobson*, 197 U.S. at 35.

71.    The United States Supreme Court had cautioned only three years earlier, "[i]t should ever be the care of courts of justice to guard human life and liberty against being sacrificed by public prejudice or excitement."  *Dreyer v. Ill.*, 187 U.S. 71, 76 (1902).

72.    Justice Harlan's caveat on his 1905 case holding in *Jacobson*, "There is, of course, a sphere within which the individual may assert the supremacy of his own will, and rightfully dispute the authority of any human government,

especially of any free government existing under a written constitution, to interfere with the exercise of that will." *Jacobson*, 197 U.S. at 29. *Jacobson* is not a Blank Check to unlimited technological advancements so long as a pharmaceutical company attaches its behavior to the word "vaccine".

### *Abdullahi v. Pfizer*, 562 F.3d 163 (2nd Cir. 2009).

73.     Numerous Nigerian plaintiffs sued Pfizer after a clinical trial there allegedly "caused the deaths of eleven children…and left many others blind, deaf, paralyzed, or brain-damaged" after "approximately two weeks" of the trial. *Id.* at ___. Also alleged, *inter alia*, was Pfizer "failed to secure the informed consent of either the children or their guardians[,]" and "failed to disclose or explain the experimental nature of the study[,]" the "test protocol" of which had been "hastily assembled." *Id.* The district court dismissed on jurisdictional grounds under the Alien Tort Statute (ATS). Reversing that jurisdictional decision, the Third Circuit subsidiarily determined "the norm prohibiting non-consensual medical experimentation on human subjects has becomes firmly embedded and has secured universal acceptance in the community of nations." *Id.* at ___. To reach that determination, the Third Circuit traced "the evolution of the prohibition into a norm of customary international law [beginning] with the war crimes trials at Nuremburg." *Id.* at ___. While at first reading it may seem hyperbolic for the Third Circuit to have started with Nuremberg, it was not, because when "Congress mandated patient-subject consent in drug research in 1962[,]" "[t]ellingly, the

sources on which our government relied in outlawing non-consensual human

medical experimentation were the Nuremburg Code and the Declaration of

Helsinki." *Id.* at ___, *citing* 21 U.S.C. § 355(i) Our statutes in the United States for

protecting a person's right to refuse experimental investigational medical products,

including vaccines, are sourced from the Nuremburg Code.

### Nuremberg Trials.

After convicting "lower-level war criminals," "including leading physicians"
of "non-consensual experiments" "testing…drugs for immunization[,]" *inter alia*,
Military Tribunal 1 "promulgated the Nuremburg Code as part of…final judgment
against fifteen doctors…." *Id.* at ___, ___ (internal brackets and quotation marks
omitted). The Code's "first principle [is] that the voluntary consent of the human
subject is absolutely essential." *Id.* at __ (internal brackets and quotation marks
omitted), *citing* Brandt, 2 Nuremburg Trials, at 181.  It is important to recognize
there were at least two categories of victims of Nazi medical experiments: First,
"subjects…who did not consent to the experiments[,]" meaning they were
"unknowing human subjects[,]" they did not know "the nature of the study[,]"
being performed on them, similar to what Nigerian plaintiffs claimed.  *Id.* at ___.
Second, involuntary subjects. *Id.* at ___.  Regarding those in the former category,
their consent was not informed if they were un-informed or mis-informed (lied to)
about the nature of the experiment.

74.    Regarding medical experiments, including those with experimental

investigational vaccines, and the principle of voluntary consent, "United States

courts examining the Nuremburg judgments have recognized that the universal and

fundamental rights of human beings identified by Nuremberg…are the direct

ancestors of the universal and fundamental norms recognized as *jus cogens*, from

which no derogation is permitted, irrespective of the consent or practice of a given

State." *Id.* at ___, *citing Siderman de Blake v. Republic of Arg.*, 965 F.2d 699, 715

(9th Cir. 1992).

**Other Cases.**

75.    The Third Circuit cited two additional international law sources supporting its determination that the norm prohibiting non-consensual medical experimentation on human subjects has becomes firmly embedded and has secured universal acceptance in the community of nations.

76.    First, Article 7 of the International Covenant of Civil and Political Rights ("ICCPR") ("no one shall be subjected without his free consent to medical or scientific experimentation") (not ratified in full by the United States). "By its terms, this prohibition is not limited to state actors; rather, it guarantees individuals the right to be free from nonconsensual medical experimentation by any entity – state actors, private actors, or state and private actors behaving in concert." *Id.* at ___.

77.    Second, the Declaration of Helsinki: Code of Ethics of the World Medical Association, art. III(3)(a), G.A. Res. (1964) (as amended) (non-binding) ("In any research on human beings, each potential subject must be adequately informed of the aims, methods, … anticipated benefits and potential risks of the study…and that researchers obtain the subject's freely given informed consent, preferably in writing.") (internal quotation marks omitted). *Id.* at ___.

78.    Finally, regarding the norm prohibiting non-consensual medical experimentation in the United States, the Third Circuit cited the following

present-day federal regulations requiring informed consent to U.S. investigators'

research, whether conducted domestically or in a foreign country, used to support

applications for the approval of new drugs: 21 C.F.R. §§ 50.20, 50.23- .25, 50.27,

312.20, 312.120 (2008); 45 C.F.R. §§ 46.111, 46.116- .117 (2008). *Id* at. ___.

deprivation of a right under authority of law, Plaintiffs' exercise of her right to

refuse cannot lawfully result in her being trespassed from the Rider campus,

Rider cannot lawfully punish Plaintiffs for the exercise of a right to refuse].

79.    Defendants cannot be permitted to continue conducting mandatory

student experiments. The legal distinction between these experimental

investigational vaccines still in clinical trial phase *authorized* by FDA for

emergency use, versus long-established *FDA-approved* vaccines, is dispositive to

the Defendants' vaccine mandate's illegality.

80.    Defendants' vaccine mandates are unlawful under 21 C.F.R. 360bbb-

3, Doe v. *Rumsfeld #1*, Doe v. *Rumsfeld #2*, international law, federal statutes,

and federal regulations as upheld in Abdullahi v. Pfizer 562 F.3d 163 (2nd Cir.

2009),  and NJ Rev Stat § 26:14-4 (2013), the law guarantees the illegality of

medical experimentation and the right to refuse investigational new drugs that

still in the clinical trial phase, and unapproved products not licensed by FDA for

any indication administered for emergency use.

81.    Even if the FDA approves and licenses existing COVID-19 vaccines,

they will remain experimental and thus subject to the international requirement

that informed consent is "absolutely essential." Nuremberg Code, Article 1;

*Addullahi v. Pfizer*, 562 F.3d 163 (2nd Cir. 2009). Phase III clinical trials for the

Pfizer vaccine do not end until May 2, 2023,

https://clinicaltrials.gov/ct2/show/NCT04368728?term=NCT04368728&draw=2

&rank=1and for the Moderna vaccine until October 27, 2022,

https://clinicaltrials.gov/ct2/show/NCT04470427?term=NCT04470427&draw=2

&rank=1; https://wonder.cdc.gov/vaers.html; 4,406xxx update deaths and 21,537

serious injuries have been reported after COVID vaccination to the Vaccine

Adverse Event Reporting System (VAERS) between December 14, 2020 and

May 21, 2021.

    82.    Supreme Court's decision in *Jacobson v. Massachusetts*, 197 U.S. 11

(1905) is not a Blank Check for any Executive Action and does not allow for just

about any executive action to pass muster in a declared emergency. Recently

Court *Roman Catholic Diocese v. Cuomo*, 592 U.S. ___; 208 L.Ed.2d 206 (2020)

refutes the dicta of Jacobson and does not relate only to religious worship.

Although it is fair to say that courts have interpreted *Jacobson* liberally, the

landmark case itself warned against actions precisely like Defendants':

> [An order] might be exercised in particular circumstances and in
> reference to particular persons in such an arbitrary, unreasonable
> manner, or might go so far beyond what was reasonably required for
> the safety of the public, as to authorize or compel the courts to
> interfere for the protection of such persons.

*Jacobson*, 197 U.S. at 28.

83.    Defendants' arbitrary and unreasonable vaccine mandate calls out for courts to "interfere" for students' protection. Jacobson acknowledges that government actors may seek to exert police powers that simply go too far:

> There is, of course, a sphere within which the individual may assert the supremacy of his own will, and rightfully dispute the authority of any human government, especially of any free government existing under a written constitution, to interfere with the exercise of that will.

*Jacobson*, 197 U.S. at 29.

84.    Mandatory injections are the kind of government action that Jacobson held beyond the pale. Over one hundred years ago, the Supreme Court acknowledged that citizens must rightfully dispute government authority when it tramples domains that must remain within the "supremacy of his own will." Surely injecting experimental chemicals into a student's body in order to attend their institution constitutes such a domain for "supremacy of his own will." Plaintiffs rightfully challenge Defendants' overreach. There is reason to believe that some courts would find COVID vaccine mandates inconsistent with Jacobson.

85.    § 505 of the federal Food, Drug & Cosmetic Act (the "FDCA") clearly provides that "[n]o person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application…is effective with respect to such drug." 21 U.S.C. § 355(a).  None of the currently-available COVID-19 vaccines has been approved pursuant to this section of the FDCA.

86.     In violation of this Section 360bbb-3, Defendants, acting under color of law, ordered mandatory vaccination of these Emergency Use Authorization products or PCR testing for all City and State employees.

87.     However, due to publicly available information, Defendants knew or should have known that PCR testing does not provide accurate, actionable diagnostic information regarding whether the test subject is infected with COVID-19, or is contagious with COVID-19, and that therefore, no reasonable basis for the privacy intrusions of the mandatory PCR testing exists.

88.     In addition to illegally mandating the use of an EUA product, Defendants have failed to inform Plaintiffs that the mandatory PCR testing has not been approved for use in humans by the FDA for the purpose of diagnosing whether they have COVID-19 or are contagious with COVID-19 as required by the statutory framework governing issuance of EUAs generally, as well as the particular EUAs authorizing the emergency use of the PCR tests.

89.     Defendants have also failed to inform Plaintiffs that they have the option to refuse the mandatory PCR testing as required by the statutory framework governing issuance of EUAs, as well as the particular EUAs authorizing the emergency use of the PCR tests.

90.     Defendants instituted the mandatory PCR testing purportedly to prevent or diminish the spread of COVID-19.

91.     However, PCR testing is not an effective diagnostic tool to achieve

this goal, as recognized by state and federal officials.

92.     A "positive" test result is not necessarily indicative of COVID-19

infection because PCR tests do not actually test for any disease or infection.

93.     PCR tests amplify biological test material taken from the test subject,

and then match it to a handful of short genetic sequences "gene snippets" from the

genome of the SARS CoV-2 virus. The test does not determine whether the test

subject is infected with any live virus, nor can it diagnose a test subject to actually

infected with, ill from, or contagious with COVID-19.

94.     As the CDC expressly states in the "Instructions for Use" of the PCR

testing kit, "[d]etection of viral RNA may not indicate the presence of infectious

virus or that 2019-nCoV is the causative agent for clinical symptoms". CDC 2019-

Novel Coronavirus (2019-nCoV) Real-Time RT-PCR Diagnostic Panel,

"Instructions for Use," Catalog # 2019-nCoVEUA-01, 1000 reactions; CDC-006-

00019, Revision: 06, CDC/DDID/NCIRD/ Division of Viral Diseases Effective:

12/01/2020, www.fda.gov/media/134922/download

95.     PCR tests are also known to produce a high level of false positives.

Varying numbers of testing "cycles" or "amplifications" drastically impact the

number of positives results. After approximately 40 amplifications, almost 100%

of the positives are likely to be false positives due to: (1) over-amplification; (2)

failure to use FDA "gold standard" Sanger sequencing to confirm each PCR

positive matches the SARS CoV-2 genetic sequence; and (3) failure to culture a

positive sample to determine infectiousness.

96.    Dr. Anthony Fauci, Director of the National Institutes of Allergy and

Infectious Diseases of the National Institutes of Health, acknowledged in July 2020

that a positive RT-PCR test result using a Ct above 35 is useless for diagnostics.

He said, "[I]f you get a cycle threshold of 35 or more, …the chance of it being

replication-competent are [sic] miniscule. And we have patients – and it's very

frustrating for the patients as well as for the physicians – somebody comes in and

they repeat their PCR, and it's like 37 cycle thresholds, but you almost never can

culture virus for a 37-cycle threshold. So, I think if someone does come in with 37-

38, even 36, you got to say, 'You know, it's just dead nucleotides, period'".

TWiV 641: COVID-19, Video interview with Dr. Anthony Fauci, This Week in

Virology, 4:22-5:10 (Jul. 16, 2020), at

https://www.youtube.com/watch?v=a_Vy6fgaBPE.

97.    In sum, the PCR test is entirely useless as a tool to identify the

presence of a SARS-CoV- 2 virus in the test subject unless the Ct is set at an

appropriate level. Even then, however, the PCR test does not diagnose whether the

test subject is infected with, ill from, or contagious with COVID-19. It merely

compares whether amplified biological test material taken from the test subject

matches a handful of genetic snippets, representing a minute portion of the SARS-

CoV-2 virus.

98.    If the Ct exceeds 28, any match is unlikely to be a confirmed infection

after culturing (were the lab to perform a culture, which they do not).

99.    Any final diagnosis that a test subject is actually infected with COVID-19, and therefore potentially contagious to others, can only be made following examination by a medical doctor. The PCR test cannot and does make that diagnosis.

100.    Defendants have unlawfully segregated employees into unequal groups based upon their consent or refusal to being subjected to mandatory PCR testing, despite the fact that PCR testing has no diagnostic value in determining whether the test subject has COVID-19, or is contagious with COVID-19 (which determination can only be made by a medical doctor following examination). Nevertheless, employees who are vaccinated are not required to submit to the PCR test while similarly situated employees who are not vaccinated will be required to submit to the PCR test.  Employees who do not submit to the PCR test can be subject to discipline up to and including termination.

101.    False positives also lead to isolation and quarantine of healthy people, in violation of federal law and the United States Constitution.

102.    The required "clearance" to work cannot be obtained without submitting to and obtaining a negative result from the mandatory PCR testing despite an employee having no signs or symptoms of illness.

103.    Upon "positive" result of a PCR test, with no further investigation into whether the employee is actually ill, the employee is prohibited from working for a

period of 14 days.

104.    The United States Constitution guarantees citizens of the United States a zone of privacy emanating from the penumbras of the Bill of Rights into which no state actor can intrude unless it is to achieve a compelling state interest through a narrowly tailored methodology. Forcing Plaintiffs to report vaccine status or submit to an unnecessary medical test when the person is exhibiting no signs of illness, unconstitutionally invades this protected zone of personal privacy.

105.    Mandatory PCR testing with no evidence of illness, impinges upon Plaintiffs' fundamental rights, and must therefore survive strict scrutiny. Under that test, Defendants must prove that these policies serve a compelling state interest and are narrowly tailored to achieve that goal. Healthy people exhibiting no symptoms of COVID-19 infection cannot be subjected to unnecessary medical testing without valid consent. Thus, it cannot be said that any compelling state interest is served by the policies complained of herein. Even if there were a compelling state interest, the dragnet testing and monitoring of each and every City and State employee is overly broad, not narrowly tailored.

**Asymptomatic Transmission Is Not the Driver of Outbreaks**

106.    Upon information and belief, given that Defendants' policies are silent as to the reasons behind the testing, masking, and segregating requirements, these are presumably, to protect against "asymptomatic transmission" of COVID-19.

107. According to Dr. Fauci, the Director of the National Institute of Allergy and Infectious Diseases and leading U.S. governmental authority on the COVID-19 pandemic:

*[T]he only thing historically that people need to realize is that, even if there is some asymptomatic transmission, in all the history of respiratory borne viruses of any time, asymptomatic transmission has never been the driver of outbreaks. The driver of outbreaks is always the symptomatic person. Even if there is a rare asymptomatic person that might transmit it, an epidemic is not driven by asymptomatic carriers*. (Emphasis added).

108. The Vaccine Adverse Events Reporting System (VAERS) is a self-reporting surveillance system designed to monitor adverse events potentially caused by vaccines. It is believed that fewer than one percent (1%) of vaccine adverse events are actually reported to VAERS. *Grant Final Report: Electronic Support for Public Health – Vaccine Adverse Event Reporting System (ESP:VAERS)* (December 1, 2007, to September 30, 2010, https://digital.ahrq.gov/sites/default/files/docs/publication/r18hs017045-lazarus-final-report-2011.pdf [as of July 21, 2021].

VAERS shows the following data for COVID-19 vaccine adverse events as of July 9, 2021[5]:
• Deaths: 10,991
• Life Threatening: 8,832
• Permanent Disability: 9,274

• Hospitalized: 30,781
• Emergency Room: 59,402
• Office Visit: 82,535
• Severe Allergic Reaction: 19,814
• Bell's Palsy: 2,885
• Heart Attacks: 3,906
• Myocarditis/Pericarditis: 2,466
• None of the above: 232,570
• Total: 463,456

109.    The Federal Government through its Department of Justice has intentionally or unintentionally caused the City and County of Honolulu and the State of Hawaii to believe that they had the apparent authority to act on the Federal Government's behalf in mandating the Vaccines which only have Emergency Use Authorization.

110.    The United States Federal Government, acting through its Department of Justice, has caused by its representations and actions, the City and County of Honolulu and the State of Hawaii to believe that both had apparent authority to mandate vaccines in the State of Hawaii. By the Federal Government giving the "green light" to the City and County of Honolulu, the County of Maui and the State of Hawaii, the City and County of Honolulu, the County of Maui and the State have relied on this representation and acted upon it in mandating vaccines to the detriment of the people of Hawaii. The United States government and XAVIER BECERRA, in his official capacity as United States Secretary of Health and

Human Services set in motion the acts of the City and County of Honolulu and the State of Hawaii and called into question the continued authorization of the Emergency Use Authorization for the subject COVID-19 vaccines. The local and State Government must cease and desist from indirectly doing on the federal government's behalf what the federal government is forbidden to do directly or the court must revoke the Emergency Use Authorization for the subject COVID-19 vaccines as mandated vaccines for an emergency based approval product are unlawful pursuant to 21 U.S. Code § 360bbb–3, *et seq*.,. The United States Government has also paid for the subject COVID-19 vaccines in full with federal monies and the City and County of Honolulu and the State of Hawaii are administering the federally paid for Emergent Use Vaccines which must remain subject to voluntary disbursement at all times relevant through approval through the mandatory Governor's and Mayor's mandatory vaccine Emergency Orders in an unlawful manner.

111.    Additionally, the Mayors of each County of the State of Hawaii have implemented inconsistent directives which trigger matters of equal protection issues for the  Plaintiffs, i.e. (1) the Mayors' directives for the islands of Kauai, Maui,  and Hawaii are requiring workers to get weekly testing if the choose not to vaccinate which is the equivalent to a testing mandate and (2) Honolulu is requiring workers to be vaccinated or terminated if they do not receive a medical or religious exemption, which is the equivalent to a vaccine mandate.

## FIRST CAUSE OF ACTION

## FEDERAL PREEMPTION

112.   Plaintiffs incorporate the foregoing paragraphs 1-111 as though fully set forth at length herein.

113.   The Supremacy Clause states:

> This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding.

U.S. CONST., art. VI.

114.   "[T]he purpose of Congress is the ultimate touchstone in every preemption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotation marks omitted). Analytically relevant is "the structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Id.* at 486 (internal citations and quotations marks omitted).

> The Supremacy Clause provides that the laws and treaties of the United States "shall be the supreme Law of the land…and any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2. Accordingly, it has long been settled that State laws that conflict with federal law are "without effect."

*Mutual Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 479-80 (2013) (citations omitted).

115.    Mandatory participation in an Emergency Use Authorization program is illegal. The COVID-19 vaccines fall into the former category, because they have not been previously FDA-approved for any use, nor have they been FDA-approved to date.

116.    The Supremacy Clause of the U.S. Constitution can nullify both state legislative requirements and state common law duties. *Medtronic v. Lohr*, 518 U.S. 470, 503 (1996) (Breyer, J., concurring in part and concurring in the judgment); *id.* at 510 (O'Connor, J., joined by Rehnquist, C.J., Scalia, J., and Thomas, J., concurring in part and dissenting in part); *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 521 (1992) (plurality opinion); *id.* at 548-49 (Scalia, J., joined by Thomas, J., concurring in judgment in part and dissenting in part). Federal law and precedent are explicit that consent to EUA products must be voluntary. 21 U.S.C. § 360bbb-3(III). The District Court erred when it failed to consider preemption.

117.    The duress that Defendants are imposing is palpable. Duress is "when the party making the claim was forced to agree to it by means of a wrongful threat precluding the exercise of his free will." *Shire Realty Corp. v. Schorr*, 55 A.D.2d 356, 365 (App. Div. 2nd Dept. 1977), *quoting Austin Instrument v. Loral Corp.*, 29 N.Y.2d 124, 130 (1971) Defendants make wrongful threats precluding Plaintiffs' free will; it is duress.

118.   21 U.S.C. § 360bbb-3 mandates prospective recipients of unapproved products offered for emergency use be informed of their ***option to accept or refuse administration*** (supra).

119.   Because it would require Plaintiffs to be vaccinated with an unapproved product against their will, the vaccine mandate is patently contrary to both the statute's requirements and to the FDA's guidance. Thus, it is contrary to the "structure and purpose" of the statute. *Lohr*, 518 U.S. at 486.

120.   Defendants might argue that the FDCA does not expressly, completely preempt the field of regulation of medical products. *See, e.g., Wyeth v. Levine*, 555 U.S. 555 (2009). But that would be beside the point, because cases like *Wyeth* concern the question whether preemption under the FDCA may be raised as a defense to a claim arising under state tort law. *See generally, Wyeth, id., Elliott v. Smith & Nephew*, Case No. 12-CV-0070, 2013 U.S. Dist. LEXIS 59072 (D. Idaho April 15, 2013) (discussing precedents). In those cases, courts look to whether it would be "impossible for a private party to comply with both federal and state requirements," *Mut. Pharm. Co.*, 570 U.S. at 480, or whether, "under the circumstances of a particular case, state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Wyeth*, 555 U.S. at 589 (Thomas, J., concurring) (citation and internal brackets omitted). *See also Arizona v. United States*, 567 U.S. 387, 399 (2012).

121.   While not all FDA pronouncements are necessarily entitled to

*Chevron* deference, *Wyeth*, 555 U.S. at 575-77, agencies like FDA "do have a unique understanding of the statutes they administer and at attendant ability to make informed determinations about how state requirements may pose an 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* at 576-77.  Here, FDA's interpretation is entitled to at least some deference. As discussed above, the intent of Section 366bbb-3 is clear on its face, and that FDA's interpretation of its scope and intent, *vis a vis* federal preemption, is consistent with the statute's plain meaning. Allowing state actors to mandate administration of an investigative medical product that has been made available pursuant to an EUA would impose "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. at 399.

122.    Here, the Defendants' vaccine mandate is clearly "an obstacle to the accomplishment and execution of the full purposes and objectives of" both sections 355 and 360bbb-3 of Title 21. Plainly read, the statutory scheme created by Congress was intended to allow *voluntary* access to experimental medical products in a public health emergency, while also protecting the right of the individual to refuse administration of the experimental product.

123.    Thus, the Defendants' vaccine mandate is preempted by federal law, rendering it "without effect." *Mutual Pharm. Co., Inc. v. Bartlett*, 570 U.S. at 479-80. The FDA expressly supports this conclusion in its Guidance for Industry and

Other Stakeholders regarding Emergency Use Authorizations:

> FDA believes that the terms and conditions of an EUA issued under section 564 [21 U.S.C. § 360bbb-3] preempt state or local law, both legislative requirements and common-law duties, that impose different or additional requirements on the medical product for which the EUA was issued in the context of the emergency declared under section 564….
>
> To the extent state or local law may impose requirements different from or in addition to those imposed by the EUA for a particular medical product within the scope of the declared emergency or threat of emergency (e.g., requirements on prescribing, dispensing, administering, or labeling of the medical product), such law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, and conflicts with the exercise of Federal authority under [§ 564].

See FDA, Emergency Use Authorization of Medical Products and other Authorities: Guidance for Industry and Other Stake Holders (January 2017), at p. 40, available online at https://www.fda.gov/media/97321/download (legal citations and internal quotation marks omitted).

## SECOND CAUSE OF ACTION
## DECLARATORY RELIEF

124.    Plaintiffs incorporate the foregoing paragraphs 1-123 as though fully set forth at length herein.

125.    Plaintiffs have a universally recognized, fundamental right to be free from human medical experimentation, a right that is protected by recognized international legal standards, international treaties to which the United States is a member, the laws and regulations of the United States, and the Due Process Clause of the Fourteenth Amendment.

126.    Moreover, Plaintiffs have a universally recognized, fundamental right

to give informed consent to any medical treatment, a right that is secured by the Due Process Clause of the Fourteenth Amendment.

127.    Plaintiffs do not consent to being administered the COVID-19 injection. All conditions precedent to these actions have been performed, excused, and/or waived.

128.    As alleged herein, the vaccines Defendants' mandated is an experimental medicine.

129.    WHEREFORE, Plaintiffs respectfully request that the Court enter a declaratory judgment that Defendant's mandate constitutes a violation of the laws of nations, that Defendants be enjoined from enacting same.

## THIRD CAUSE OF ACTION

## VIOLATION OF UNITED STATES LAW

130.    Plaintiffs incorporate the foregoing paragraphs 1-129 as though fully set forth at length herein.

131.    Title 21 United States Code, Section 360bbb-3(e)(1)(A)(ii), and regulations and internal protocols of the United States Food and Drug Administration promulgated thereunder, provide in relevant part that all individuals to whom an investigational product is to be administered under an Emergency Use Authorization be informed "of the option to accept or refuse administration of the product. . . ."

132.    Because the COVID Vaccine is an investigational product, approved

for use under an Emergency Use Authorization, United States law prohibits its administration to any person who does not consent.

133.    Plaintiffs do not consent to being administered the COVID-19 injection. The Mandate is therefore patently contrary to United States law, and is therefore preempted and invalid.

134.    Title 21, Part 50 of the Code of Federal Regulations governs the protection of human subjects in the conduct of all clinical investigations regulated by the U.S. Food and Drug Administration. 116. 21 C.F.R. § 50.20 provides that, "[e]xcept as provided in §§ 50.23 and 50.24, no investigator may involve a human being as a subject in research covered by these regulations unless the investigator has obtained the legally effective informed consent of the subject or the subjects legally authorized representative."

135.    Because it has not yet completed Phase III trials, and the COVID-19 Vaccine remains in the clinical investigation stage.

136.    None of the exemptions provided in sections 50.23 and 50.24 would apply to Plaintiffs.

137.    Accordingly, the Mandate at issue violates federal regulations governing the administration of experimental medicine, and is thus preempted.

138.    Plaintiffs have no adequate remedy at law available against Defendants for the injuries and the irreparable harm they will imminently suffer as a direct result of the Mandate.

139.    WHEREFORE, Plaintiffs respectfully request that the Court enter a Temporary Injunction, declaratory judgment that Defendant's mandating administration of the mandatory vaccines to each of them violates the laws and regulations of the United States governing the administration of investigational medical products, and such further relief as the Court deems just and proper.

## FOURTH CAUSE OF ACTION

## VIOLATION OF SUBSTANTIVE DUE PROCESS

## 42 U.S.C. § 1983

140.    Plaintiffs reallege and incorporate by reference their allegations in Paragraphs 1-139, as if fully alleged herein, and further allege as set forth above, the COVID-19 Vaccine constitutes experimental medicine.

141.    Plaintiffs do not consent to being administered the COVID Vaccine. The forcible administration of an experimental medical procedure on the health population of this State violates the laws and regulations of the United States, as well as Plaintiffs' right to substantive due process under the Fourteenth Amendment of the United States Constitution.

142.    Additionally, or in the alternative, even if the COVID Vaccine was not experimental, Plaintiffs have a liberty interest, secured by the Due Process Clause of the Fourteenth Amendment, to be free from nonconsensual medical procedures.

143.    Defendants have failed to demonstrate a compelling state interest in

forcibly administering the COVID Vaccine, or the forcible administration of the

COVID Vaccine lacks a rational basis or is not sufficiently narrowly tailored to

serve a compelling state interest, because:

        a.     The COVID Vaccine is experimental, as described herein;

        b.     The COVID Vaccine does not prevent transmission, but only

prevents disease or serious symptoms;

        c.     COVID-19 is, for plaintiffs and those similarly situated, far less

dangerous than seasonal influenza;

        d.     Plaintiffs have a reasonable fear of suffering serious and

permanent injuries from the COVID Vaccine;

        e.     the adjuvant(s) used in the COVID Vaccine is unsafe for use in

humans; and/or, without limitation,

        f.     adequate means exist to protect vulnerable persons without

infringing on the rights of those who do not consent to being administered the

COVID Vaccine.

144.    The harm to Plaintiffs cannot be adequately redressed in the event

that the Emergency Order is carried out.

145.    WHEREFORE, Plaintiffs respectfully request that the Court enter a

declaratory judgment that Defendants' mandating administration of the COVID

Vaccine to each of them violates their rights to substantive due process and/or their

liberty interests under the Fourteenth Amendment to the Constitution of the United

States, that Defendants be enjoined from administering any vaccine to any Plaintiff without that Plaintiff's express informed consent, and that the Court grant Plaintiffs an award of attorneys' fees and costs as provided in 42 U.S.C. § 1988 as well as such further relief as the Court deems just.

**FIFTH CAUSE OF ACTION**

**PROCEDURAL DUE PROCESS**

**42 U.S.C. § 1983**

146.    Plaintiffs reallege and incorporate by reference their allegations in Paragraphs 1 – 145, as if fully alleged herein, and further allege:

147.    The Fourteenth Amendment to the United States Constitution forbids a state from depriving anyone of life, liberty, or property without due process of law.

148.    The COVID Vaccine has not been fully tested, as alleged hereinabove. Therefore, its medical impact on the individual Plaintiffs herein has not been established. Upon information and belief, the COVID Vaccine will impact different recipients differently based upon their individual medical history and profile. Thus, each recipient's reaction to the COVID Vaccine is unique and unknown.

149.    Therefore, the forced administration of the COVID Vaccine represents a distinct invasion and deprivation of each unwilling recipient's life, liberty and property interest inconsistent with the procedural due process required

by the Fourteenth Amendment. This invasion and deprivation, being unique to each Plaintiff--all of whom object to receiving the experimental vaccine absent informed consent--requires a process to ensure that the vaccine is administered only after each Plaintiff has been provided with complete information regarding the impact of the vaccine on him/her, and can make an informed and voluntary choice as to whether or not to receive the vaccine. Minimum procedural due process elements of informed consent are set forth in and required by 21 U.S.C. § 360bbb-3 and 21 C.F.R. § 50.25.

150.    The Vaccine Mandate requiring Plaintiffs to be forcibly vaccinated with an experimental vaccine additionally violates Plaintiffs' rights to procedural due process under the Fourteenth Amendment to the United States Constitution for failure to provide:

a.    the right to notice and an opportunity to be heard by a court or neutral arbitrator;

b.    the right to present evidence and witnesses;

c.    the right to subject Defendants' agents and experts to cross-examination;

d.    the right to a reasoned decision; and/or, without limitation,

e.    the right to have an opportunity to lodge an appeal.

151.    The harm to Plaintiffs cannot be adequately redressed in the event that the Emergency Order is carried out.

152.    WHEREFORE, Plaintiffs respectfully request that the Court enter a declaratory judgment that Defendants' vaccine mandate violates their rights to procedural due process under the Fourteenth Amendment to the Constitution of the United States, that Defendants be enjoined from enacting same, and that the Court grant Plaintiffs an award of attorneys' fees and costs as provided in 42 U.S.C. § 1988 as well as such further relief as the Court deems just.

### SIXTH CAUSE OF ACTION
### VIOLATION OF INTERNATIONAL LAW
### 42 U.S.C. § 1983

153.    Plaintiffs reallege and incorporate by reference their allegations in Paragraphs 1 – 152, as if fully alleged herein, and further allege:

154.    As further alleged hereinabove, the prohibition against nonconsensual administration of an experimental medical treatment to human subjects constitutes a jus cogens norm under the laws of nations. A jus cogens norm is a peremptory norm that permits no derogation by any nation.

WHEREFORE, Plaintiffs and those similarly situated to them respectfully ask this Court to:

A.    Find and declare that the COVID-19 injection, as it is being used by Defendants, is an investigational new drug within the meaning of 21 U.S.C. § 360bbb-3;

B.    Find and declare that COVID-19 injection has been in investigational new drug status since the original investigational new drug application was filed in 2020;

C.      Find and declare that COVID-19 injection cannot be made

mandatory;

D.      Enjoin Defendant from requiring inoculation of the COVID-19

injection;

E.      Award Plaintiffs their costs and attorneys' fees and any other relief

this Court may find appropriate.

## SEVENTH CAUSE OF ACTION

## EQUAL PROTECTION

155.    Plaintiffs incorporate paragraphs 1 – 154 as though fully set forth

herein.

156.    Plaintiffs are subject to disparate treatment since vaccinated

employees are not required to be tested in order to enter work.

157.    This disparate treatment is actionable.  Further, in the event that full

vaccine licensure is granted after the time of filing. Plaintiffs object to the mandate

as being illegal, experimental and unconstitutional.

## EIGHTH CAUSE OF ACTION

## 5th AMENDMENT RIGHT TO BODILY INTEGRITY

158.    Plaintiffs reallege and incorporate by reference their allegations in

Paragraphs 1 – 157, as if fully alleged herein, and further allege:

159.    This violates the equal protection clause of the 5th Amendment, and

applicable to the States and state actors under the 14th Amendment.

160.    *Jacobson* requires that at any vaccine mandate policy's necessity, proportionality, reasonableness, harm avoidance and non-discrimination based on the U.S. Supreme Court's landmark decision *Jacobson v. Massachusetts*, (1905). There is reason to believe that some courts would find COVID vaccine mandates inconsistent with *Jacobson*.

161.    The foregoing paragraphs are repeated and incorporated as though fully set forth herein.

162.    Petitioners assert the Due Process Clause of the Fifth Amendment upholds the fundamental right of an individual to personal bodily integrity in medical decision making.

## NINTH CAUSE OF ACTION

## VIOLATION OF RIGHTS SUBSTANTIVELY GUARANTEED BY THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT

### (Brought Pursuant to 42 U.S.C. § 1983)

163.    The allegations in paragraphs 1 through 162 of this Complaint are incorporated and realleged as though fully set forth herein.

164.    The Due Process Clause protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed. *Washington v. Glucksberg*, 521 U.S. 702, 720-

21 (1997). The Due Process Clause includes a substantive component that bars arbitrary, wrongful, government action "regardless of the fairness of the procedures used to implement them." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990).

165.    The Due Process Clause recognizes that certain interests are so substantial that no process is enough to allow the government to restrict them absent a compelling state interest. *Washington v. Glucksberg*, 521 U.S. at 719.

166.    Plaintiffs have a fundamental right to direct their personal medical care and medical decisions fall squarely within that liberty interest.

167.    Defendants have deprived Plaintiffs of the right to direct their personal medical care and medical decisions, in violation of the Fourteenth Amendment.

168.    Plaintiffs have no adequate remedy at law. Plaintiffs will continue to suffer irreparable harm unless Defendants are enjoined from enforcing their coercive policies.

## TENTH CAUSE OF ACTION

## VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE

## FOURTEENTH AMENDMENT

### (Brought Pursuant to 42 U.S.C. § 1983)

169.    Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 168 above as if fully alleged herein.

170.   The Equal Protection Clause of the Fourteenth Amendment prohibits governmental classifications that affect some groups of citizens differently than others. *Engquist v. Or. Dept. of Agric.*, 553 U.S. 591, 601 (2008). The touchstone of this analysis is whether a state creates disparity between classes of individuals whose situations are arguably indistinguishable. *Ross v. Moffitt*, 417 U.S. 600, 609 (1974). Because the CDC's own data shows that vaccinated and unvaccinated individuals can contract COVID-19 and spread the disease, Defendants created disparity between classes of individuals whose situations are arguably indistinguishable.

## ELEVENTH CAUSE OF ACTION

## VIOLATION OF TITLE 21 UNITED STATES CODE,

## SECTION 360BBB-3

171.   Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 170 above as if fully alleged herein.

172.   Federal laws and regulations governing the approval and administration of medical products such as PCR tests completely preempt any and all contrary or inconsistent laws and policies of state and local governments, including the policies promulgated by Defendants challenged herein.

173. The PCR tests mandated by said Defendants remain investigational products in accordance with the FDA's Emergency Use Authorization of those products.

174.   Title 21 United States Code, § 360bbb-3(e)(1)(A)(ii) requires that all individuals to whom an investigational product available only pursuant to Emergency Use Authorization is to be administered be informed "of the option to accept or refuse administration of the product…"

175.   Plaintiffs do not consent to being subjected to PCR testing without showing signs of illness.

176.   Defendants' mandatory PCR testing are patently contrary to United States law, and thus preempted and invalid.

## TWELFTH CAUSE OF ACTION

## Violation Of 21 U.S. Code § 360bbb–3

## (By Plaintiffs against all Defendants)

177. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 176 as though fully set forth herein.

178. "Under section 564 of the Federal Food, Drug, and Cosmetic Act (FD&C Act), when the Secretary of HHS declares that an emergency use authorization is appropriate, FDA may authorize unapproved medical products or unapproved uses of approved medical products to be used in an emergency to diagnose, treat, or prevent serious or life-threatening diseases or conditions caused by [chemical, biological, radiological, and nuclear] threat agents when certain criteria are met, including there are no adequate, approved, and available

alternatives." *Emergency Use Authorization | FDA,*

https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-

and-policy-framework/emergency-use-authorization [as of July 21, 2021].

179. The relevant portion of the FD&C Act, found at 21 U.S. Code §

360bbb–3(e)(1)(A)(ii), imposes the following conditions on the dissemination of

products that have received emergency use authorization:

Appropriate conditions designed to ensure that individuals to whom the

product is administered are informed:

(I) that the Secretary has authorized the emergency use of the product;

(II) of the significant known and potential benefits and risks of such use, and

of the extent to which such benefits and risks are unknown; and

(III) of the option to accept or refuse administration of the product, of the

consequences, if any, of refusing administration of the product, and of the

alternatives to the product that are available and of their benefits and risks."

180.   Defendants and their policies are in violation of 21 U.S. Code §

360bbb–3(e)(1)(A)(ii) (III) by failing to provide the required option to refuse PCR

testing to prevent the transmission of SARS-CoV-2.

## THIRTEENTH CAUSE OF ACTION

### Denial Of Civil Rights Under 42 U.S.C. § 1983 (Fourth Amendment)

### (By All Plaintiffs against all Defendants)

181.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 180 as though fully set forth herein.

182.   This cause of action is brought pursuant to 42 U.S.C. § 1983 and the Fourth Amendment to the United State Constitution.

183.   The Fourth Amendment of the United States Constitution states that all citizens have the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]"

184.   The Fourth Amendment applies to government action that intrudes upon an individual's reasonable expectation of privacy. *Katz v. U.S.* (1967) 389 U.S. 347, 361.

185.   Collection of deoxyribonucleic acid ("DNA") or other biologic material from a person constitutes a search and seizure and intrusion into the privacy interests of that person protected by the Fourth Amendment to the United States Constitution. *Skinner v. Ry. Labor Executives' Ass'n* (1989) 489 U.S. 602, 616; *Winston v. Lee* (1985) 470 U.S. 753, 760 (1985); *Schmerber v. California* (1966) 384 U.S. 757, 767-68; *U.S. v. Kincade* (9th Cir. 2004) 379 F.3d813, 821. 134. "[T]he Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." *Maryland v. King* (2013) 569 U.S. 435, 438; *Schmerber*, *supra*, at 768 (internal citations omitted). "As the text of the Fourth Amendment indicates, the ultimate measure of the

constitutionality of a governmental search is 'reasonableness.'" *Ibid.;* quoting

*Vernonia Sch. Distr. 47J* v. *Acton* (1995) 515 U. S. 646, 65w. In determining

whether the intrusion is "reasonable," the Court has preferred "some quantum of

individualized suspicion . . . [as] a prerequisite to a constitutional search or

seizure." *Ibid.*

186.   Plaintiffs have a reasonable expectation of privacy in their body

cavities, as well as in their personal medical, health and genetic information. *See*

*Rakas et al. v. Illinois* (1978) 439 U.S. 128.

187.   Defendants' indiscriminate, mandatory surveillance testing program

of all unvaccinated or "exempted" employees, regardless of symptomology or

exposure, is unsupported by either individualized suspicion or sufficient special

needs to justify such any intrusion into their reasonable expectations of physical

and personal privacy. As such, Defendants' mandatory surveillance testing

program violates Plaintiffs' Fourth Amendment rights. *See, e.g., B.C. v. Plumas*

*Unified Sch. Dist.* (9th Cir. Sep. 20, 1999, No. 97-17287) 1999 U.S. App. LEXIS

38863, at \*22-24.

## FOURTEENTH  CAUSE OF ACTION

## Deprivation of Civil Rights Under The First Amendment Right To Free

## Exercise Under 42 U.S.C §1983

## (All Plaintiffs Against All Defendants)

188.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 187 as though fully set forth herein.

189.   The First Amendment provides the right of Plaintiffs to the free exercise of religion.

190.   Defendants' COVID-19 policies are not neutral and generally applicable because they exempt employees from the same requirements.

191.   Defendants' COVID-19 policies constitute a substantial burden on Plaintiff's free exercise of religion under the First Amendment because Defendants are imposing various burdensome and equally-offensive requirements as a condition of employment, based solely upon their religious beliefs, which prevent them from participating in the policies. Defendants' discriminatory, burdening policies cannot satisfy strict scrutiny because Defendants are allowing other employees to participate in employment otherwise fully, without restriction or condition, even though these employees also present a threat of COVID-19.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment in their favor and against Defendants and each of them and for relief as follows:

A.    That this court assume jurisdiction over this matter.

B.    Order that Plaintiffs may maintain this action as a class action pursuant to Rule 23, Federal Rules of Civil Procedure.

C.   Declare Defendants actions unlawful.

D.   Order that Defendants are to provide Plaintiffs with due process and medical privacy and autonomy to make their own health care decisions when they exhibit no signs of sickness as healthy people cannot be subjected to unnecessary medical tests or quarantined.

E.   Order that the Mandated Vaccination Emergency Orders be stricken as to the Vaccine Mandate of an Emergency Use Authorization Product.

F.   Award to Plaintiffs their costs and reasonable Attorneys' fees.

G.   For such other relief as this Court deems just and equitable.

DATED:   Honolulu, Hawaii, August 13, 2021.


/s/ Shawn A. Luiz
SHAWN A. LUIZ

Attorneys for Plaintiffs