## PLAINTIFFS' OPPOSITION TO THE CITY AND COUNTY OF HONOLULU AND MAYOR'S MOTION TO DISMISS

To not be redundant, Plaintiff incorporate by reference all those arguments set forth in Plaintiffs' Opposition to HHS Becerra's Motion to Dismiss and the Opposition to the State Of Hawaii and Governor Ige's Motion to Dismiss, Plaintiffs' Supplemental Brief in Support of Plaintiffs' Motion for Temporary Restraining Order and the Declarations and Exhibits attached thereto, filed August 27, 2021.

## I.  Plaintiffs' claims are entitled to proceed

Plaintiffs incorporate by reference the Reply re the SOH and Governor Ige's Opposition and the HHS Secretary Becerra's Opposition. Plaintiffs are likely to succeed on merits; Plaintiffs would be irreparably harmed in absence of injunctive relief; and the public interest favors injunctive relief. As Exhibit "2" attached to Plaintiffs' Supplemental Brief establishes, the City set itself as the final arbiter of what the Plaintiffs are allowed to believe and how the Plaintiffs may practice their religion which unlawfully infringes on the First Amendment's Free Exercise clause made applicable to the State's via the Fourteenth Amendment. Disallowing objections to a specific vaccine nullify and neuters Plaintiffs' sincerely held religious beliefs to object to a specific vaccine. Plaintiffs object to the vaccine and Exhibit "2", including but not limited to, "pro-life" grounds or "the body is a

temple of the Holy Spirit" grounds. A Federal Court in N.Y. entered a restraining

Order for violating the free exercise clause. See Exhibit "1". A Federal Court in

L.A. entered a restraining Order for violating the free exercise clause. See Exhibit

"2".

"At a minimum, a plaintiff seeking preliminary injunctive relief must

demonstrate that it will be exposed to irreparable harm." *Caribbean Marine Servs.

Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citation omitted).

"[A]n alleged constitutional infringement will often alone constitute irreparable

harm," *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997).

Exhibit "2" shows that the City is engaging in unlawful establishment of religion,

chilling of the Free Exercise clause by deciding what is a *valid* "sincerely held

religious belief". Many of the class members object to the vaccine based on the

destruction of life used to create the vaccine. Other's object based on the many

other various biblical scriptures to treat one's body as a temple of the Holy Spirit.

The maxim, "My body, my choice" aptly applies here as a fundamental right is

implicated. Constitutionally mandated religious liberty, free exercise, and

conversely, Constitutionally forbidden practices such as the establishment of

religion and separation of church and state prevent the restrictive language

violating free exercise in Exhibit "2".

Finally, the State and County Mandates are preempted by the EUA Act as the federal government, alone, regulates EUA, the alleged FDA approved vaccine without its liability shield is not in distribution yet, and in any event, at the time the Governor and Mayors issued their respective Emergency Orders, the vaccine the Plaintiffs were mandated to take is an EUA Product.  See Footnotes 8 and 9 to Exhibit "5" attached to Plaintiff's Supplemental Brief filed August 27, 2021.

## II.    This case is not moot

Moreover, this case is not moot as it is a class action with hundreds of Plaintiffs, and regardless is capable of repetition yet evading review. The City has issued exemptions to ten of the twelve class representatives but has not voluntarily ceased using the unconstitutional language regarding Exhibit "2" for any Plaintiff seeking a religious exemption. This Honorable Court may still order the Defendants to cease using the offending language in requests for religious exemptions found in Exhibit "2". On August 13, 2021, Plaintiffs commenced this action on behalf of themselves and those similarly situated[1]. This matter is capable of repetition yet evading review. Hundreds of other potential class members' claims have not yet been mooted as to their respective requests for relief. For Judicial economy this case was commenced as a class action because it meets all

---

[1] Plaintiffs have not moved for class certification yet but will do so at the appropriate time.

the requirements for a class such as numerosity of the Plaintiffs, typicality of claims, and common issues of fact and law. Rather than flood the federal court in Honolulu with 1,200 individual lawsuits, this is the ideal way for this matter affecting all the potential class members to be resolved fairly and efficiently. Plaintiffs must be given leave to amend the complaint to add additional class representatives and/or class members whose claims have not been mooted.

Moreover, a plaintiff's challenge will not be moot where it seeks declaratory relief as to an ongoing policy as here (See Exhibit "2"). *City of Houston, Tex. v. Dep't of Housing & Urban Dev., 24 F.3d 1421, 1429 (D.C.Cir.1994)*; Del Monte Fresh Produce Co. v. United States, 570 F.3d 316, 321 (D.C. Cir. 2009)

Importantly, Exhibit "2" shows that the City infringed on the free exercise clause by telling the Plaintiffs what they could not believe as a sincerely held religious belief despite U.S. Supreme Court precedent forbidding heresy trials as the City attempted to hold here.

If it is so vital that the Plaintiffs be vaccinated, it is quite strange that Honolulu's Elected Officials and the Honolulu City Council are exempt from the Honolulu Mayor's mandate.  The Honolulu Mayor and the City's elected officials such as the Office of the Prosecuting Attorney and the City Council do not need to comply and are exempt from the vaccine mandate yet Plaintiffs are not exempt.

### III.    Plaintiffs have sufficient standing

A plaintiff invoking federal jurisdiction bears the burden of establishing the "irreducible constitutional minimum" of standing by demonstrating (1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, and (3) likely to be redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351. Pp. 1546 – 1547.

The form that Defendants required Plaintiffs to complete in order to seek a religious exemption chills free exercise in that it specially states that one cannot object to a particular vaccine. See, for example, *Corporation for the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 343-346 (1987) where, in a concurring opinion, JJ. Brennan and Marshall talk about "the risk of chilling" in the Free Exercise context. Because many Christians object to the subject vaccine's origin of being derived, tested, and produced using aborted fetal cells, the Court must order the Defendants to strike the offending language from the form (Exhibit "2") the Plaintiffs were required to complete. See Document 15-7, page 6 of 6.  See Declarations of Plaintiffs attached to supplemental brief filed August 27, 2021.

Federal courts have authority under the Constitution to decide legal questions only in the course of resolving "Cases" or "Controversies." Art. III, § 2. One of the essential elements of a legal case or controversy is that the plaintiff have standing to sue. Standing requires more than just a "keen interest in the

issue." *Hollingsworth v. Perry,* 570 U.S. 693, 700, 133 S.Ct. 2652, 186 L.Ed.2d 768 (2013). It requires allegations—and, eventually, proof—that the plaintiff "personal[ly]" suffered a concrete and particularized injury in connection with the conduct about which he complains. *Spokeo, Inc. v. Robins,* 578 U.S. ——, ——, 136 S.Ct. 1540, 1547–1548, 194 L.Ed.2d 635 (2016). In a case arising from an alleged violation of the Establishment Clause, a plaintiff must show, as in other cases, that he is "directly affected by the laws and practices against which [his] complaints are directed." *School Dist. of Abington Township v. Schempp,* 374 U.S. 203, 224, n. 9, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). Plaintiffs are directly affected by the laws and practices against which their complaints are directed. Plaintiffs are told that they cannot object to a specific vaccine which forbids Plaintiffs from having certain sincerely held religious beliefs which runs directly afoul of the free exercise clause. The Statement continued on the religious exemption form, plaintiffs exhibit 2, attached to supplemental memorandum prevents Plaintiffs from objecting to the vaccine based on the use of aborded fetal cells in the production, testing of the three subject vaccines. would prevent plaintiffs from objecting on that basis.

**IV.**  **The prohibition on objecting to a specific vaccine despite the development of the vaccine using aborted fetal cell lines violates the free exercise of religion.**

The prohibition on objecting to a specific vaccine despite the development of the vaccine using aborted fetal cell lines[2] violates the free exercise of religion.

Plaintiffs' beliefs do not need to acceptable to the employer's logic or beliefs. See *U.S. v. Ballard,* 322 U.S. 78 at pages 86-87; *U.S. v Hoffman*, 436 F Supp 2nd 1272 (2020).

The Free Exercise Clause of the First Amendment, which has been applied to the States through the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof....*" (Emphasis added).  *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940)

As the U.S. Supreme Court so eloquently stated previously, "The principle that government may not enact laws that suppress religious belief or practice is so well understood that few violations are recorded in our opinions". *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 523, 113 S. Ct. 2217, 2222, 124 L. Ed. 2d 472 (1993).

---

[2] The manufacturers of the Covid vaccines currently available developed and confirmed their vaccines using fetal cell lines, which originated from aborted fetuses. ( https://lozierinstitute.org/an-ethics-assessment-of-covid-19-vaccine-programs/ ) For example, each of the currently available Covid vaccines confirmed their vaccine by protein testing using the abortion-derived cell line HEK-293. ( https://lozierinstitute.org/an-ethics-assessment-of-covid-19-vaccine-programs/ ). Plaintiffs' object on many different religious grounds to partaking in a vaccine derived, tested, and produced using aborted fetal cells.

"[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Review Bd. of Indiana Employment Security Div.,* 450 U.S. 707, 714, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981).

Courts should not undertake to dissect religious beliefs because the believer admits that he is "struggling" with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ. *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.,* 450 U.S. 707, 715, 101 S. Ct. 1425, 1430, 67 L. Ed. 2d 624 (1981).

Moreover, "[T]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect. Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation." *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.,* 450 U.S. 707, 715-716, 101 S. Ct. 1425, 1431, 67 L. Ed. 2d 624 (1981).

In *United States v. Ballard*, 322 U.S. 78, 85–88, 64 S. Ct. 882, 886–87, 88 L. Ed. 1148 (1944) the Supreme Court of the United States compared questioning one's religious beliefs to a heresy trial which is forbidden by the First Amendment:

Heresy trials are foreign to our Constitution. Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs.

Religious experiences which are as real as life to some may be incomprehensible to others. Yet the fact that they may be beyond the ken of mortals does not mean that they can be made suspect before the law.

*United States v. Ballard*, 322 U.S. 78, 85–88, 64 S. Ct. 882, 886–87, 88 L. Ed. 1148 (1944)

Moreover, the Court in two cases, *Sherbert* and *Thomas*, established and reestablished, respectively, that an individual cannot be forced to choose between adhering to religious belief and employment:

The respondents also contend that *Sherbert* is inapposite because, in that case, the employee was dismissed by the employer's action. But we see that Mrs. Sherbert was dismissed because she refused to work on Saturdays after the plant went to a 6-day workweek. … In both cases, the termination flowed from the fact that the employment, once acceptable, became religiously objectionable because of changed conditions.

*Thomas v. Rev. Bd. of Indiana Emp. Sec. Div*., 450 U.S. 707, 716–18, 101 S. Ct. 1425, 1431–32, 67 L. Ed. 2d 624 (1981).

The Plaintiffs are entitled to a injunctive relief because the CDC has represented that masks work; the CDC has represented that social distancing works; and the CDC has represented that testing works. See https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html and https://www.cdc.gov/coronavirus/2019-ncov/hcp/testing-overview.html. Defendants have less restrictive alternatives that would not burden religion or the free exercise thereof as would the vaccine mandate.  For the same reasons *Thomas* was not narrowly tailored, the vaccine mandate in the Plaintiffs

9

case at bar was not narrowly tailored. *Thomas v. Rev. Bd. of Indiana Emp. Sec.
Div.,* 450 U.S. 707, 718–19, 101 S. Ct. 1425, 1432, 67 L. Ed. 2d 624 (1981)

In Plaintiffs' case, the prohibition on objecting to a particular vaccine, i.e.
objecting on the basis of a vaccine in which aborted fetal cells were used in the
development, testing and production of the three EUA vaccines, is not neutral,
targets religious beliefs, and unduly burdens the free exercise thereof:

A law burdening religious practice that is not neutral or not of general application
must undergo the most rigorous of scrutiny. To satisfy the commands of the First
Amendment, a law restrictive of religious practice must advance " 'interests of the
highest order' " and must be narrowly tailored in pursuit of those interests... A law
that targets religious conduct for distinctive treatment or advances legitimate
governmental interests only against conduct with a religious motivation will
survive strict scrutiny only in rare cases.

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546, 113
S. Ct. 2217, 2233, 124 L. Ed. 2d 472 (1993).

The vaccine mandate prohibiting objection to a particular vaccine is
designed to oppress a religion or its practices and is unlawful.  The Honolulu's
Mayor's mandated was meant to neutralize any dissent based on sincerely held
religious belief to the specific vaccine and is unlawful.  Moreover, there is no
"pandemic exception" to the law or the Constitution. *Justice Gorsuch concurring
Roman Catholic Diocese v. Cuomo,* 592 U. S. ____ (2020), *Per Curiam*. The loss
of First Amendment freedoms, for even minimal periods of time, unquestionably
constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Roman
Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 67-68 (2020). The City and

County of Honolulu may not attempt to suppress objections based on a sincerely

held religious beliefs to a vaccine that was manufactured, tested, and produced

using aborted fetal cells.

Even is the policy at issue here was facially neutral, and it is not, that would

not end the inquiry:

We reject the contention advanced by the city, see Brief for Respondent 15, that our inquiry must end with the text of the laws at issue. Facial neutrality is not determinative. The Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination. The Clause "forbids subtle departures from neutrality," *Gillette v. United States,* 401 U.S. 437, 452, 91 S.Ct. 828, 837, 28 L.Ed.2d 168 (1971), and "covert suppression of particular religious beliefs," *Bowen v. Roy, supra,* 476 U.S., at 703, 106 S.Ct., at 2154 (opinion of Burger, C.J.).

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534, 113 S. Ct. 2217, 2227, 124 L. Ed. 2d 472 (1993).

After all, "[R]eligious experiences which are as real as life to some may be

incomprehensible to others." *United States v. Ballard*, 322 U.S. 78, 86-87, 64 S.Ct.

882, 88 L.Ed. 1148 (1944).

In determining whether a set of beliefs should be protected as "religious,"

the Ninth Circuit has analyzed "whether the beliefs professed … are sincerely held

and whether they are, in [a claimant's] own scheme of things, religious." *United

States v. Ward*, 989 F.2d 1015, 1018 (9th Cir. 1992) (quoting *United States v.

Seeger,* 380 U.S. 163, 174, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965)). " 'Religious'

beliefs, then, are those that stem from a person's 'moral, ethical, or religious beliefs

about what is right and wrong' and are 'held with the strength of traditional

religious convictions.' " *Ward,* 989 F.2d at 1018 (quoting *Welsh v. United States,*

398 U.S. 333, 340, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970)).

The Ninth Circuit's approach:

The Ninth Circuit's approach has been called "a generous functional[5] (and even
idiosyncratic)" approach to determining religiosity. *1281 *Grove v. Mead Sch.
Dist. No. 354*, 753 F.2d 1528, 1537 (9th Cir. 1985) (Canby, J., concurring). This
standard draws heavily from *United States v. Seeger*, in which the Supreme Court
considered claims brought by individuals who requested draft exemptions based on
spiritual, ethical, and philosophical objections to war. 380 U.S. at 164, 85 S.Ct.
850. The *Seeger* Court analyzed whether the claimants' beliefs "occup[ied] the
same place in the life of the objector as an orthodox belief in God holds in the life
of one clearly qualified for the exception[.]" *Id.* Applying this test, the Court found
conscientious-objector status warranted for, among others, a claimant with a
"belief in and devotion to goodness and virtue for their own sakes, and a religious
faith in a purely ethical creed ... without belief in God, except in the remotest
sense." *Id.* at 166, 85 S.Ct. 850 (internal quotation marks omitted).

United States v. Hoffman, 436 F. Supp. 3d 1272, 1280–81 (D. Ariz. 2020).
A substantial burden exists "when individuals are forced to choose between

following the tenets of their religion and receiving a governmental benefit" or

when a believer is "coerced to act contrary to their religious beliefs by the threat of

civil or criminal sanctions" as is the case here in Plaintiffs' case at bar. *Navajo*

*Nation v. U.S. Forest Serv.,* 535 F.3d 1058, 1067 (9th Cir. 2008).  Exhibit "2"

attached to the Plaintiffs Supplemental Brief filed August 27, 2021, leave no room

for doubt that the restriction is not a general law applicable to all citizens but to

only those seeking a sincerely held religious belief in opposing a specific vaccine,

i.e. targeting specific sincerely held religious beliefs.

Requiring the Government to "demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest is the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). The "compelling interest" inquiry requires courts to look past "broadly formulated interests," and to instead "scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 431, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006). "The least-restrictive-means standard is exceptionally demanding." *Hobby Lobby,* 573 U.S. at 728, 134 S.Ct. 2751. The Government "must demonstrate that 'no alternative forms of regulation' would" suffice to accomplish the Government's compelling interest. *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 480 (5th Cir. 2014) (quoting *Sherbert v. Verner*, 374 U.S. 398, 407, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)). This "focused inquiry" means that the Court may "not ease the government's burden by rubberstamping vague or generalized arguments about means and ends." *Christie*, 825 F.3d at 1063. See also Fulton v. City of Philadelphia, Pennsylvania, 141 S. Ct. 1868, 1877, 210 L. Ed. 2d 137 (2021). There, the Supreme Court held that: city burdened agency's religious exercise by putting agency to choice of curtailing its mission or approving relationships inconsistent with its beliefs; non-discrimination requirement in city's standard

13

foster care contract was not generally applicable, and thus was subject to strict

scrutiny; agency was not a public accommodation subject to city ordinance's

prohibition on discrimination on the basis of sexual orientation when agency

certified foster parents; maximizing the number of foster families was not a

compelling interest that justified city's burdening of agency's free exercise rights;

protecting city from liability was not a compelling interest that justified city's

burdening of agency's free exercise rights; and city's interest in the equal treatment

of prospective foster parents and foster children, though weighty, was not a

compelling interest that justified city's burdening of agency's free exercise rights.

Id.

Government fails to act neutrally when it proceeds in a manner intolerant of

religious beliefs or restricts practices because of their religious nature.

See *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 584 U. S. ——,

—— – ——, 138 S.Ct. 1719, 1730–1732, 201 L.Ed.2d 35 (2018); *Lukumi*, 508

U.S. at 533, 113 S.Ct. 2217.  Form "2 attached to the supplemental brief filed

August 27, 2021 does just that.

By analogy and importantly, sincere beliefs in other constitutional right

contexts does not have to be an "all or nothing approach" as Exhibit "2"

unlawfully attempts to do in violation of the free exercise clause. Even in a military

context, one can voluntary enlist and still be a conscious objector to certain combat

activities as long as the objections are sincere. For example, the Second Circuit

in *Ferrand v. Seamans, 488 F.2d 1386 (2 Cir. 1973),* found that approval of the

use of force in some limited circumstances, such as to restrain wrongdoing, does

not preclude conscientious objection toward war. <u>See also</u> *United States v. Orr,*

*474 F.2d 1365, 1369 (2 Cir. 1973).*

### <u>V.</u> The City's Unconstitutional violation of the Free Exercise clause set forth in the vaccine mandate is unquantifiable in monetary terms and Plaintiffs are not seeking monetary damages in any event

Exhibit "2" shows that the City is engaging in unlawful establishment of

religion, chilling of the free exercise by deciding what is a valid sincerely held

religious belief. Many of the class members object to the vaccine based on the

destruction of life used to create the vaccine.

The vaccine mandate chills speech in speaking out against vaccine mandates

by the City creating fear that employees are prohibited from including sincerely

held religious beliefs to the development, research and production methods used in

the three subject vaccines. Damages are assumed in a violation of constitutional

rights. It also chills speech in that the employees may be afraid to tell whether they

are vaccinated or not. Historically these same first responders have been taught to

respect HIPAA and healthcare privacy rights and records, and the police are taught

to uphold and protect the civil rights of citizens in the community. Now their

whole world has been turned upside down by the vaccine mandate and everything

they were taught about HIPAA and healthcare privacy rights and records and upholding and protecting civil rights of themselves has been cast aside in their circumstances. Further the employer is allowed to be held harmless for any vaccine injuries which causes further vaccine hesitancy in addition to Plaintiffs' sincerely held religious beliefs.

## VI.    Reasonable alternatives

This Honorable Court may take judicial notice pursuant to FRE 201 that the CDC already stated that wearing a mask and social distancing works. See https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html. The CDC already stated that testing works. See https://www.cdc.gov/coronavirus/2019-ncov/hcp/testing-overview.html. Policies and laws that affect or target fundamental rights must be narrowly tailored to not step on and undermine constitutional rights.

## VII.    Federal preemption

Plaintiffs' federal preemption claim raises triable issues of fact. Footnote 8 of the August 23, 2021, letter (Exhibit "5") states the products are legal distinct. U.S.A. claims the vaccines are one and the same but there is two August 23, 2021, letters simultaneously approving a FDA and an EUA vaccine. Footnote 9 admits that there is not sufficient doses available for the U.S. population which is why the EUA Product will remain in distribution. Additionally, only expert witnesses can conclude

whether the vaccines are one and the same or legally distinct. Because Defendants claim the vaccines are one and the same, and plaintiffs dispute this fact based on the two August 23, 2021 letters (Exhibits "5" and "6") that the products are legally distinct, Plaintiffs are entitled to engage in discovery and discovery facts from Defendants to prove their claim. Based on this fact alone, an order restraining the vaccine mandate, except for weekly testing, should be granted and Defendant's motion to dismiss denied.

## VIII.  The Vaccines No Longer Can Prevent Transmission of COVID-19 per the CDC Director

In the Motion to Dismiss, the SOH Defendants misrepresent that the vaccines can prevent transmission. Defendants wrongly claim, "All three vaccines are safe and highly effective at preventing COVID-19 infection, moderate to severe illness, and death." See SOH Memo to Motion at page 4.

The vaccines no longer prevent transmission any longer. On August 6, 2021, CDC Director Rochelle Walensky, in an interview with CNN's Wolf Blitzer, said the vaccines will not prevent the spread of Covid-19: "Our vaccines are working exceptionally well, they continue to work well for delta with regard to severe illness and death, they prevent it, but what they can't do anymore is prevent transmission."

See CDC Director Rochelle Walensky tells Wolf Blitzer that COVID ...

https://www.youtube.com › watch

(Aug 8, 2021 — CDC Director Rochelle Walensky tells Wolf Blitzer that COVID Vaccines won't prevent transmission. 5,480 views5.4K views.)

Further, the Defendants and their counterparts in state governments used the specter of "asymptomatic spread" — the notion that fundamentally healthy people could cause COVID-19 in others — to justify the purported emergency. But there is *no credible scientific evidence* that demonstrates that the phenomenon of "asymptomatic spread" is real. On the contrary, on June 7, 2020, Dr. Maria Von Kerkhov, head of the WHO's Emerging Diseases and Zoonosis Unit, told a press conference that from the known research, asymptomatic spread was "very rare." "From the data we have, it still seems to be rare that an asymptomatic person actually transmits onward to a secondary individual." She added for emphasis: "it's very rare." Researchers from Southern Medical University in Guangzhou, China, published a study in August 2020 concluding that asymptomatic transmission of COVID-19 is *almost non-existent*. "Asymptomatic cases were least likely to infect their close contacts," the researchers found. A more recent study involving nearly 10 million residents of Wuhan, China found that there were no — zero — positive COVID-19 tests amongst 1,174 *close contacts* of asymptomatic cases, *indicating the complete absence of asymptomatic transmission*.

On September 9, 2020, Dr. Fauci was forced to admit in an official press conference:

> *[E]ven if there is some asymptomatic transmission, in all the history of respiratory borne viruses of any type, asymptomatic transmission has never been the driver of outbreaks. The driver of outbreaks is always a symptomatic person, even if there is a rare asymptomatic person that might transmit, an epidemic is not driven by asymptomatic carriers.*

As was also noted in the *BMJ Opinion*, Pfizer/BioNTech and Moderna reported the relative risk reduction of their vaccines, but the manufacturers did not report a corresponding absolute risk reduction, which "appears to be less than 1%"  See https://www.statnews.com/2021/01/23/asymptomatic-infection-blunder-covid-19-spin-out-of-control/ (last visited July 15, 2021).

Doshi P. Peter Doshi: Pfizer and Moderna's "95% effective" Vaccines— Let's Be Cautious and First See the Full Data. [(accessed on 23 December 2020)]; Available online: https://blogs.bmj.com/bmj/2020/11/26/peter-doshi-pfizer-and-modernas-95-effective-vaccines-lets-be-cautious-and-first-see-the-full-data/

Because the vaccines do not prevent transmission of Covid-19, the City's Vaccine Mandate is not rationally related to the City's objective of slowing the spread of Covid-19. Trends in countries where vaccination rates are high — like Israel — do not reflect that vaccines broadly reduce hospitalizations for Covid.

Because the Plaintiffs are not in demographic groups at high-risk for serious Covid19 morbidity or mortality, vaccinating them is not reasonably likely to result in meaningful changes in the County's Covid-19 morbidity and mortality statistics.

Because the vaccines no longer prevent transmission of the virus, vaccinating the Plaintiffs is not reasonably likely to reduce secondary infections of other citizens with whom the Plaintiffs might come into contact.

The City has not used the least restrictive means to accomplish its compelling state interest. Masks and testing, for example, have been widely touted as a safe and effective means of controlling the spread of the virus, yet the City has not any scientific basis for failing to offer its employees an alternative to use masks and testing during period of high community transmission instead of coercing vaccination. See https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html.  See also https://www.cdc.gov/coronavirus/2019-ncov/hcp/testing-overview.html

Defendants' belief that the vaccine is effective against infection, serious illness and death, the World Health Organization state otherwise: "We do not know whether the vaccine will prevent infection and protect against onward transmission. … In the meantime, we must maintain public health measures that work: masking, physical distancing, handwashing, respiratory and cough hygiene, avoiding crowds, and ensuring good ventilation." Sep. 2, 2021 https://www.who.int/news-

room/feature-stories/detail/the-moderna-covid-19-mrna-1273-vaccine-what-you-
need-to-know. *See* Sep. 2, 2021 https://www.who.int/news-room/feature-
stories/detail/who-can-take-the-pfizer-biontech-covid-19--vaccine ("There is
currently no substantive data [] available related to impact of Pfizer BioNTech
vaccine on transmission or viral shedding.").

**IX.    Problems with reporting vaccine related injuries and deaths**

Defendants provided no evidence that the VAERS death incidents were not
causally linked to the vaccines. See the three Defendants' Memorandums of Law,
generally. See also especially the State Defendants' Memorandum of Law at page
5.  Moreover, Defendants misrepresent the value of the Vaccine Adverse Event
Reporting System (VAERS).  Congress intended VAERS "to serve as the 'front
line' of vaccine safety, since this type of national reporting system can rapidly
document possible effects and generate early warning signals that can then be more
rigorously investigated in focused studies. VAERS is considered especially
valuable in assessing the safety of newly marketed vaccines."  106th Congress, 2d
Session.  House Report 106-977. Committee on Government Reform: The Vaccine
Injury Compensation Program: Addressing Needs and Improving Practices.  Oct.
12, 2000 https://www.congress.gov/106/crpt/hrpt977/CRPT-106hrpt977.pdf.

Unfortunately, serious problems underlie FDA's postmarket surveillance
system.  "Since VAERS is a passive system, it is inherently subject to

underreporting. For example, a confidential study conducted by Connaught

Laboratories, a vaccine manufacturer, indicated that 'a **fifty-fold underreporting**

of adverse events' is likely." Goldman, GS & Miller, NZ. Relative Trends in

Hospitalizations and Mortality Among Infants by the Number of Vaccines Doses

and Age, Based on the VAERS, Oct. 31, 2012

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3547435/ ("Goldman"). "While []

VAERS may be lauded as the 'front line' of vaccine safety, the lack of

enforcement provisions and effective monitoring of reporting practices preclude

accurate assessments of the extent to which adverse events are actually reported.

Former FDA Commissioner David A. Kessler, who is now on the COVID-19

advisory panel, has estimated that VAERS reports currently represent only a

fraction of the serious adverse events. Goldman. (citing Kessler, David A. FDA:

Introducing MEDWatch, June 9, 1993

https://www.fda.gov/media/78526/download). U.S. Department of Health and

Human Services, *Electronic Support for Public Health-Vaccine Adverse Event*

*Reporting System (ESP:VAERS)* 6, 2010

https://digital.ahrq.gov/sites/default/files/docs/publication/r18hs017045-lazarus-

final-report-2011.pdf ("Adverse events from drugs and vaccines are common, but

**underreported**. Although 25% of ambulatory patients experience an adverse drug

event, less than 0.3% of all adverse drug events and 1-13% of serious events are

reported to the Food and Drug Administration (FDA). Likewise, **fewer than 1%** of vaccine adverse events are reported. Low reporting rates preclude or slow the identification of 'problem' drugs and vaccines that endanger public health. New surveillance methods for drug and vaccine adverse effects are needed. Barriers to reporting include a lack of clinician awareness, uncertainty about when and what to report, as well as the burdens of reporting: reporting is not part of clinicians' usual workflow, takes time, and is duplicative.") (emphasis added).

## **X.**     **Nowhere in CDC guidance states that vaccinated persons do not spread the virus.**

Nowhere in CDC guidance states that vaccinated persons do not spread the virus.  Fully vaccinated people must take the same precautionary measures as unvaccinated people to prevent spreading of the virus.  *See* CDC, *Interim Public Health Recommendations for Fully Vaccinated People,* Sep. 1, 2021, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html (providing guidelines for fully vaccinated people to prevent spreading of the virus).

Additionally, such a mandate sends a false message that vaccinated people are less likely to spread the virus when they are infected.  Evidence shows that the vaccinated persons can spread the virus. CDC found that "fully vaccinated people who become infected with the Delta variant can spread the virus to others." CDC,

*Interim Public Health Recommendations for Fully Vaccinated People,* Sep. 1, 2021, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html.  Vaccinated persons should follow the same preventative measures as its counterparts.  *See also id.* (providing guidelines for fully vaccinated people to prevent spreading of the virus).  Even Rochelle Walensky, the director of Centers for Disease Control and Prevention and a former professor of Harvard Medical School, "issued repeated warnings -- including confessing a sense of 'impending doom' -- that premature easing of restrictions combined with the spread of a more contagious variant threatens to lead to a fourth surge here similar to that already under way in Europe."  Powell, Alvin. The Harvard Gazette, *Approval of at-home tests releases a powerful pandemic-fighting weapon*, April 2, 2021 https://news.harvard.edu/gazette/story/2021/04/approval-of-at-home-tests-releases-a-pandemic-fighting-weapon/.

Defendant's myopic view in combating the spread has cost the liberty of Plaintiffs and many other similarly situated people.  Plaintiffs remind the public that the key to preventing the spread comes from other proven preventative strategies.  One such preventative measure, as CDC advised, is to "practic[e] hand hygiene is a simple yet effective way to prevent infections."  CDC, *Hand Hygiene in Healthcare Settings,* https://www.cdc.gov/handhygiene/index.html.  "Clean hands save lives."  CDC, When and How to Wash Your Hands, June 10, 2021

https://www.cdc.gov/handwashing/when-how-handwashing.html.  Handwashing is

one of the best ways to protect yourself and your family from getting sick.  *Id.*  The

grim reality is that workplaces do not push for these guidelines, particularly in

places where they ought to.  "On average, healthcare providers clean their hands

less than half of the times they should. On any given day, about one in 31 hospital

patients has at least one healthcare-associated infection." *See also* CDC: Hand

Hygiene.  *See* WHO Guidelines on Hand Hygiene in Health Care 2009

https://apps.who.int/iris/bitstream/handle/10665/44102/9789241597906_eng.pdf

("provid[ing] a comprehensive review of scientific data on hand hygiene rationale

and practices in health care.").

Vaccines, while useful, have a waning effect and infections have increased

in fully vaccinated people.  CDC confirmed that the vaccine protection is waning

and infections rates have increased.  Rosenberg, Eli S., PhD., *et. al.*, Morbidity and

Mortality Weekly Report, *New COVID-109 Cases and Hospitalizations Among*

*Adults, by Vaccination Status - New York, May 3-July 25, 2021*, Sep. 17, 2021,

https://www.cdc.gov/mmwr/volumes/70/wr/mm7037a7.htm?s_cid=mm7037a7_w

(citing Ministry of Health, *Decline in Vaccine Effectiveness Against Infection and*

*Symptomatic Illnesses*, May 7, 2021).  Israel's statistics clearly show that being

vaccinated did not reduce transmission of infections.  *See* World Health

Organization, *Israel: WHO Coronavirus Disease (COVID-19) Dashboard*,

https://covid19.who.int/region/euro/country/il (accessed Sep. 17, 2021).

The aforementioned evidence supports that infections in both fully

vaccinated and unvaccinated persons can transmit and spread the virus.

### XI.    Conclusion

The Motion should be denied or Plaintiffs allowed to amend their complaint.

### XII.    Word Count:

In accordance with 7.4 (c) and (e), this brief contains no more than 6,250

words (5832) and also complies with LR7.4(e).


DATED: Honolulu, Hawaii, September 27, 2021.

/s/ Shawn A. Luiz
SHAWN A. LUIZ
MICHAEL JAY GREEN
KRISTIN COCCARO
Attorneys for Plaintiffs